Pee Curiam :
Under the order of reference and the order of the court dated April 12,1963, this case was referred to Trial Commissioner Mastín G. White with directions to make findings of fact and recommendation for a conclusion of law. *714 Tbe commissioner lias done so in an opinion and report filed on April 2, 1964. Exceptions to the commissioner’s report !and briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the findings, opinion and recommended conclusion of law of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $1,609. Plaintiff’s motion to strike defendant’s brief and for costs is denied.
OriNiON op Commissioner

Breach of Contract

The plaintiff was the successful bidder on, and subsequently performed, a large construction contract at the Ladd Air Force Base in Alaska. The contract, involving both unit-price items and fixed-cost items, was entered into between the plaintiff and the defendant on October 14, 1953. It was administered for the defendant by the Corps of Engineers, United States Army.
One of the unit-price items, designated as Item No. 1, related to structural excavation and covered an estimated quantity of 35,500 cubic yards of such excavation. Approximately 30 percent of this structural excavation was to be done at two sites, which are involved in the present action. The excavation at one of these sites was to be done in preparation for the installation of works designated as Increments L-3 and L-4; and the excavation at the other site was for works designated as Increments L-5 and L-6. The two sites were located approximately 1,750 feet apart. The excavation at each site was to be about 25 feet deep, 130 feet long, and 30 feet wide at the widest point.
The plaintiff contends — and the evidence shows — that in connection with the issuance on July 29,1953, of the invitation for bids on the proposed contract, the defendant made to prospective bidders, including the plaintiff, misrepresentations concerning the subsurface conditions that had been encountered in previously drilling two 30-foot test borings at the respective excavation sites which are involved in the *715 present litigation. The misrepresentations related to the purported absence of permafrost -within the 30-foot depth of each of the two test borings.
The Ladd Air Force Base is located on the flood plain of the Tanana River in the vicinity of Fairbanks, Alaska. The ground in this area, down to a depth of approximately 400 feet from the surface, consists of alluvial or stream-laid deposits in the form of strata that are made up of silt, sand, or gravel, or mixtures of these materials.
Another geographical and geological feature of great significance from the standpoint of the present litigation is that the Ladd Air Force Base is located within the discontinuous permafrost zone. Permafrost is ground that is permanently frozen (i.e., its temperature has been below zero degrees centigrade for 2 years or more). There are three permafrost zones — the continuous permafrost zone, the discontinuous permafrost zone, and the sporadic permafrost zone. In the continuous permafrost zone, permafrost underlies the surface of the ground everywhere; and there is certainty that anyone drilling or excavating below the surface to a substantial depth at any point will encounter permafrost. In the discontinuous permafrost zone, permafrost underlies the surface of the ground at most places but not everywhere; and there is better than a 50 percent probability that anyone drilling or excavating below the surface to a substantial depth at any point, without previous subsurface exploration, will encounter permafrost. In the sporadic permafrost zone, permafrost underlies the surface of the ground in some places but not in most places; and there is less than a 50 percent chance that anyone drilling or excavating below the surface to a substantial depth at any point, without previous subsurface exploration, will encounter permafrost.
Permafrost, when encountered in the vicinity of the Ladd Air Force Base, is sometimes in the form of a stratum and sometimes in the form of a pocket.[1] It is much more difficult and expensive to excavate than the unfrozen alluvial soils of the area.
*716 Permafrost is to be distinguished from seasonal frost, which is ground that is frozen at and somewhat below the surface in the cold-weather months, but does not remain permanently frozen.
In connection with the invitation for bids leading up to the contract that is involved in this case, the defendant furnished to prospective bidders, including the plaintiff, written data in the form of profile drawings and related legends that purported to show the results of 33 test borings that had been accomplished by the defendant for the purpose of ascertaining subsurface conditions at the Ladd Air Force Base. The two test borings with which we are primarily concerned were designated as drill holes 260 and 261.
The written data relative to drill hole 260 furnished by the defendant to the plaintiff and other prospective bidders indicated (among other things) that this hole had been drilled on February 2, 1953; that it had been drilled at a point on the southeastern edge of the prospective excavation limits for L-3 and L-4; that it had gone to a depth of 30 feet from the surface of the ground; and that the ground was unfrozen throughout the 30-foot depth of the hole (i.e., that no seasonal frost or permafrost was encountered).
The written data relative to drill hole 261 furnished by the defendant to prospective bidders indicated (among other things) that this hole had been drilled on February 10,1953; that it had been located within the limits, and at the east end, of the prospective excavation for L-5 and L-6; that it had gone to a depth of 30 feet; and that the ground was unfrozen throughout the 30-foot depth of the hole.
The representations by the defendant to prospective bidders that only unfrozen ground had been encountered within the respective 30-foot depths of drill holes 260 and 261 were untrue. Actually, in drilling hole 260, permafrost had been encountered at a depth of 12 feet below the surface of the ground, and the permafrost extended from the 12-foot level down to the bottom of the hole at a depth of 30 feet. Similarly, in drilling hole 261, the defendant had encountered permafrost at a depth of 7 feet below the surface of the *717 ground, and the permafrost had extended down to the bottom of this hole at a depth of 30 feet.[2]
The work of excavating at the site of Increments L-3 and L-4 was begun on June 3,1954, and such work was begun at the site of Increments L-5 and L-6 on June 5,1954. Several days later, as the excavation work was in progress, permafrost was encountered at each of the two sites.[3] The permafrost in the excavation for L-5 and L-6 was encountered at an average depth of about 7 feet below the surface of the ground; and, as it was later discovered, the permafrost extended to the bottom of this excavation. The permafrost in the excavation for L-3 and L-4 was encountered at an average depth of about 10 feet below the surface of the ground; and it, too, extended downward to the bottom of the excavation.
When permafrost was first encountered in excavating at the two sites mentioned in the preceding paragraph, an effort was made to cope with the permafrost by using the equipment that was then working in each excavation, i.e., a bulldozer and ripper and a dragline. An attempt was made to rip the permafrost, assemble the broken pieces with a bulldozer, and then remove this material with a dragline. Progress was so slow, however, that it was necessary to shift to the process of blasting the permafrost. Preparations for the blasting were begun on June 10,1954. This involved the assembling of additional equipment, such as drills, compressors, trucks, and powder magazines, and also additional manpower. The preparations had been completed by June 14,1954, and blasting was begun on that date. Thereafter, blasting was used exclusively as the means of breaking up the permafrost in the two excavations, until a point some 2 or 3 feet above the bottom of each excavation was reached. The holes for the *718 blasting were drilled in the permafrost to a depth of 5 or 6 feet; and then, after each “shot” in an excavation, a bulldozer and a dragline were moved to the site for the purpose of assembling and removing the pieces of permafrost broken by the blast. Because of the proximity of an aircraft runway to each excavation, the defendant regulated the timing of, and the amount of powder used in, the various “shots,” so as to avoid interference with air traffic. This caused delay in connection with the excavation of the permafrost. The last 2 or 3 feet of permafrost in each excavation was ripped loose and then removed, instead of being blasted.
A total of approximately 5,964 cubic yards of permafrost was removed from the two- excavations with which we are concerned. The reasonable extra cost of removing the permafrost, over and above the reasonable cost of removing an equivalent quantity of unfrozen ground at the two sites, amounted to approximately $4.20 per cubic yard, and thus totaled approximately $25,049.
The plaintiff, in submitting its bid and in entering into the contract, had a right to rely upon the positive representations that were made by the defendant regarding the subsurface conditions that purportedly had been encountered in drilling holes 260 and 261. Levering & Garrigues Co. v. United States, 73 Ct. Cl. 566, 574 (1932). Such positive representations amounted to a warranty (Atlantic Dredging Co. v. United States, 53 Ct. Cl. 490, 502 (1918), aff’d 253 U.S. 1), and established a predicate for a possible action for breach of contract when it was later discovered by the plaintiff that the defendant’s representations concerning subsurface conditions at the two points were untrue (Frank P. Ragonese et al. v. United States, 128 Ct. Cl. 156, 163 (1954), 120 F. Supp. 768). It was not incumbent upon the plaintiff, prior to submitting its bid and entering into the contract, to conduct its own investigation in order to ascertain the truth or falsity of the defendant’s positive assertions regarding subsurface conditions encountered in drilling holes 260 and 261, even though the contract contained a general condition stating that “The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface *719 materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government,” and also contained a technical provision stating that “the Government does not guarantee that materials other than those disclosed by the explorations [i.e., the test borings] will not be encountered.” Hollerbach v. United States, 233 U.S. 165, 172 (1914); Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 365 (1963), 312 F. 2d 408. A significant factor in this connection was the circumstance that the physical conditions dealt with in the defendant’s untrue representations were hidden in the subsurface, and the plaintiff could not determine the truth or falsity of the representations by mere observation. Atlantic Dredging Co. v. United States, supra, at p. 502.
Perhaps it should be mentioned that there is no evidence in the record indicating any intention on the part of the defendant to deceive the plaintiff (or any other prospective bidder) in connection with the furnishing of the untrue information regarding the subsurface conditions that were encountered in drilling holes 260 and 261. On the contrary, the evidence warrants the inference that the untrue representations made to the plaintiff (and to other prospective bidders) by the defendant were the result of negligence, rather than bad faith, in connection with the preparation of the bid documents. However, the lack of what the Supreme Court has referred to as a “sinister purpose” is immaterial. Christie v. United States, 237 U.S. 234, 242 (1915).
On the other hand, mere proof of the defendant’s misrepresentations is not sufficient to justify a judgment in favor of the plaintiff. A further prerequisite to recovery by the plaintiff is proof that the plaintiff was misled by such misrepresentations. Frank P. Ragonese et al. v. United States, supra, at p. 162. The plaintiff’s case is weak as to the latter point.
The official of the plaintiff corporation who was in charge of the work of preparing and submitting the plaintiff’s bid on the contract did not testify at the trial. Consequently, the record is lacking in direct evidence with respect to the effect upon this official’s subjective mental processes of the defend *720 ant’s misrepresentations concerning the subsurface conditions that were encountered in drilling holes 260 and 261.
When all the pertinent evidence in the record is considered, it seems clear that the plaintiff could not reasonably have been misled by the defendant’s misrepresentations concerning drill holes 260 and 261 into believing that no permafrost would be encountered in excavating the two sites that are involved in the present litigation. Kather, the situation seems to have been one where the plaintiff was well aware that some permafrost might be encountered in performing the excavation work at the two sites.
In the first place, the plaintiff, when it submitted its bid and entered into the contract, was experienced in the area and had general knowledge of the widespread, though discontinuous, existence of permafrost in the vicinity of the Ladd Air Force Base. Consequently, it is reasonable to infer that the plaintiff was aware of the likelihood that some permafrost would be encountered in any large excavation project of the sort involved here.
In the second place, the contract contained a provision that specifically informed the plaintiff of the likelihood of encountering permafrost. This provision was phrased in the following language:
_ This base is located in an area in which frost-susceptible materials and permafrost are frequently encountered. The area is underlain by a deep alluvium of river deposits in varying strata, the soils being primarily of glacial origin. Sub-surface investigations near the site have disclosed that either or both frost-susceptible soils and permafrost may be found beneath the existing surface.
In the third place, the incorrect data which the defendant furnished to the plaintiff with respect to the purported subsurface conditions that had been encountered in drilling holes 260 and 261 represented only a portion of the material which the defendant furnished to the plaintiff (and other prospective bidders) regarding subsurface conditions disclosed as a result of test borings; and it must be concluded that the overall result of such information was to alert the plaintiff to the spotty existence of permafrost in the area. As mentioned earlier in this opinion, the defendant furnished *721 to the plaintiff (and other prospective bidders) written data purporting to show the results of 33 test borings. Such material indicated that slightly more than half of the test borings had been performed at points so distant from the two excavation sites with which we are concerned that they are not material to the issues in the present litigation. However, the data concerning 13 test borings — in addition to drill holes 260 and 261, previously discussed — are pertinent. The defendant’s representations concerning these 13 test borings (none of which is alleged to have misled the plaintiff in so far as they purported to show the presence or absence of permafrost) are summarized in paragraphs (c)-(f) and (h)-(p) of finding 6.
The representations concerning the 13 test borings referred to in the preceding paragraph indicated that permafrost had been encountered 10 feet below the surface of the ground at the east end of the site for L-3 and L-4, and slightly to the north of drill hole 260; that permafrost had been encountered 12 feet below the surface of the ground at a point approximately 500 feet southwest of the site for L-3 and L-4; that no permafrost had been encountered in a boring taken to a depth of 16 feet at a point approximately 300 feet southeast of the site for L-3 and L-4; that no permafrost had been encountered in a boring that had gone to a depth of 16 feet at a point approximately 600 feet southeast of the site for L-3 and L-4; that permafrost had been encountered 10 feet below the surface at a point adjacent to, and just northwest of, the site for L-5 and L-6; that permafrost had been encountered 6 feet below the surface at a point about 100 feet south of the site for L-5 and L-6; that no permafrost had been encountered in a boring that had gone to a depth of 16 feet at a point approximately 300 feet southwest of the site for L-5 and L-6; that no permafrost had been encountered in a boring that had gone to a depth of 15 feet at a point approximately 400 feet southeast of the site for L-5 and L-6; that no permafrost had been encountered in a boring that had gone to a depth of 15 feet at a point approximately 600 feet southwest of the site for L-5 and L-6; that permafrost had been encountered about 14 feet below the surface at two different points within the 1,750- *722 foot intervening area between the site for L-3 and L-4 and the site for L-5 and L-6; that permafrost had been encountered about 131/2 feet below the surface at a point approximately 750 feet northeast of the site for L-5 and L-6, and approximately 1,000 feet northwest of the site for L-3 and L-4; and that permafrost had been encountered 14 feet below the surface at a point approximately 750 feet southeast of the site for L-5 and L-6, and approximately 1,100 feet southwest of the site for L-3 and L-4. These data furnished by the defendant to the plaintiff in connection with the bid papers were clearly sufficient to indicate to a reasonably prudent bidder that permafrost was widespread in the area of the two excavation sites and might well be encountered in performing the excavation work at the two sites, even though the information which tire defendant furnished as to holes 260 and 261 incorrectly showed an absence of permafrost at the particular points where those holes were drilled.
In connection with the point discussed in the preceding paragraph, it should be mentioned that data concerning subsurface conditions developed as a result of test borings in the area of the Ladd Air Force Base must be regarded as having limited applicability in so far as they show the presence or absence of permafrost. This is necessarily so because of the discontinuous nature of the permafrost in that area. For example, when permafrost is encountered in a test boring at a certain depth, it can reasonably be presumed that permafrost also exists at the same depth in the ground extending outward in all directions from the boring for a distance of about 10 feet; but such a discovery cannot be accepted as providing a basis for a reasonable presumption concerning the existence of permafrost at a distance of more than 10 feet from the boring. Similarly, when permafrost is not encountered in a test boring, it can reasonably be presumed that no permafrost exists in the ground extending outward in all directions from the boring for a distance of about 10 feet, and down to whatever depth the boring was taken; but the lack of permafrost at the place of the boring cannot be accepted as the basis for a reasonable presumption regarding the lack of permafrost at a distance of more than 10 feet from the boring. Therefore, the incorrect informa *723 tion which the defendant furnished to the plaintiff concerning the purported lack of permafrost at the places where holes 260 and 261 were drilled could not reasonably be accepted by the plaintiff as indicating the lack of permafrost throughout the large areas of the two excavations that are before the court for consideration.
It appears, therefore, that the plaintiff could reasonably have been misled by the defendant’s misrepresentations concerning drill holes 260 and 261 only to the extent that the plaintiff later encountered, and was compelled to excavate, permafrost within a radius of about 10 feet from the points where these holes were erroneously shown by the defendant as having been drilled without encountering permafrost. Thus, the reasonable effect of the defendant’s misrepresentations was limited to a total of approximately 383 cubic yards of permafrost; and the plaintiff’s damages from the breach of contract based upon such misrepresentations amounted only to approximately $1,609.

Equitable Adjustment

Because of encountering permafrost in the two excavations discussed in the first part of this opinion, and also in a third excavation for works designated as Increment L-l, the plaintiff submitted to the administrative agency a claim for an equitable adjustment under the “Changed Conditions” provision of tire contract. That provision stated in part as follows:
Should the contractor encounter * * * during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or _ unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase * * * of cost * * * resulting from such conditions. If the parties fail to *724 agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
“Clause 6 hereof” was the provision of the contract dealing with the subject of “Disputes.” It stated in part as follows:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing * * *. Within 30 days from the receipt thereof, the Contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless within 30 days after the receipt thereof by the Contractor, he appeals in writing to the Secretary [of the Army], which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision, or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. * * *
In connection with the “Disputes” provision of the contract, it should be noted that, pursuant to the so-called Wunderlich Act (41 U.S.C. § 321 (1958)), an administrative determination on a question of fact made under the standard disputes provision of a Government contract is entitled to finality only if it is supported by substantial evidence, in addition to meeting the standard of a lack of fraud, arbitrariness, capriciousness, and gross error implying bad faith.
The plaintiff’s claim for an equitable adjustment was denied by the contracting officer, whereupon the plaintiff took an appeal under the “Disputes” provision of the contract to the Chief of Engineers. The appeal was referred to the Corps of Engineers Claims and Appeals Board as the duly authorized representative of the Chief of Engineers for the handling of such matters. The Board’s decision, following a rather lengthy hearing, was favorable to the plaintiff with respect to the encountering of permafrost in the excavation for Increment L-l, but was unfavorable to the plaintiff with respect to the encountering of permafrost in the excavations for Increments L-3 and L-4 and Increments L-5 and L-6.
*725 The plaintiff next appealed to the Secretary of the Army, and the appeal was considered by the Armed Services Board of Contract Appeals as the duly authorized representative of the Secretary. With respect to the portion of the plaintiff’s claim relating to L-l, the ASBCA held for the plaintiff on the basis of the following finding:
* * * We find the evidence establishes that the contractor encountered permafrost with respect to Increment L-l, which constituted a “changed condition” within the meaning of the pertinent article in the prime contract. * * * The contractor is entitled to an equitable adjustment with respect to the permafrost encountered in excavating for the construction of Increment L-l.[4]
However, the Armed Services Board of Contract Appeals disallowed the portions of the plaintiff’s claim relating to the permafrost in the excavations for Increments L-3 and L-4 and Increments L-5 and L-6. With respect to the encountering of permafrost in these two excavations, the ASBCA made the following factual determination:
* * * [T]he boring logs, taken as a whole * * * clearly indicate that the contractor should have expected to encounter permafrost in excavating for the sites for Increments L-3, L-4, L-5, and L-6. * * * From such drawings the Board finds that the contractor should have expected permafrost * * *.
There is nothing in the record to indicate that the factual determination of the Armed Services Board of Contract Appeals to the effect that “the contractor should have expected permafrost” in excavating the sites for Increments L-3 and L-4 and Increments L-5 and L-6 was fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith; and such factual determination was supported by substantial evidence, both in the record that was before the *726 ASBCA at the time and in the whole record that is before the court. Consequently, in so far as the plaintiff’s claim for an equitable adjustment is concerned, the factual determination of the ASBCA is final and conclusive under the “Disputes” provision of the contract and under the related provision of the Wunderlich Act.
It will be noted, though, that the factual determination of the Armed Services Board of Contract Appeals was merely that the plaintiff should have expected to encounter some permafrost in excavating at the two sites that are involved in the present litigation. The ASBCA did not make — and, in view of the evidence before it, could not properly have made — a factual finding to the effect that the plaintiff should have expected to encounter permafrost in the immediate vicinity of the points where the defendant’s drawings incorrectly showed holes 260 and 261 to have been drilled without encountering permafrost. Therefore, even if the ASBCA’s factual determination that “the contractor should have expected [some] permafrost” in excavating the sites for Increments L-3 and L-4 and Increments L-5 and L-6 is pertinent to the breach of contract issue discussed in the first part of this opinion, it does not affect the conclusion previously stated that the plaintiff has a cause of action for breach of contract in so far as the plaintiff encountered, and was compelled to excavate, permafrost in the immediate vicinity of the points where holes 260 and 261 were erroneously shown by the defendant as having been drilled without encomitering permafrost.
Also, the permafrost near drill holes 260 and 261 certainly came within the category of “subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings,” as this phrase was used in the “Changed Conditions” provision of the contract; and the action of the ASBCA in rejecting the plaintiff’s claim under the “Changed Conditions” provision of the contract was erroneous as to this relatively small amount of permafrost. However, the figure of $1,609 previously mentioned as the plaintiff’s damages for the breach of contract in this respect *727 would constitute an adequate equitable adjustment under tbe “Changed Conditions” provision of the contract.[5]
FINDINGS OF FACT
1. (a) On July 29, 1953, the defendant (acting through the District Engineer, Alaska District, Corps of Engineers, U.S. Army) issued an invitation for bids on a proposed contract for the construction of an aircraft fueling system at the Ladd Air Force Base in Alaska. The bids were to be broken down into various unit-price items and various fixed-cost items.
(b) One of the unit-price items, designated as Item No. 1, related to “Excavation, Structural (for Structures, Tanks, Access Eoads, Bulk Storage and Transfer Facilities and Hydrant refueling Facilities).” This item covered an estimated quantity of 35,500 cubic yards of excavation. Approximately 30 percent of this structural excavation was to be done at two sites, one designated as Increments L-3 and L-4 and the other designated as Increments L-5 and L-6. The two sites were located approximately 1,750 feet apart.
(c) The excavations at L-3 and L-4 and at L-5 and L-6 were to be, at each of the two sites, about 25 feet deep, 130 feet long, and 30 feet wide at the widest point. The excavation was to precede the construction at each site, on a fixed-cost basis, of a buried fuel-tank installation, a surface pump-house, hydrant outlets, and meter pits.
*728 2. The Ladd Air Force Base, where the proposed contract mentioned in finding 1 was to be performed, is located on the flood plain of the Tanana River in the vicinity of Fairbanks, Alaska. The ground in this area, down to a depth of approximately 400 feet from the surface, consists of alluvial or stream-laid deposits. The alluvial deposits, although irregular, are generally composed of strata arranged in the following order: silt, sandy silt, silty sand, sand, gravelly sand, sandy gravel, and gravel.
3. (a) The Ladd Air Force Base is located within the discontinuous permafrost zone. Permafrost is ground that is permanently frozen (i.e., its temperature has been below zero degrees centigrade for 2 or more years). There are three permafrost zones — the continuous permafrost zone, the discontinuous permafrost zone, and the sporadic permafrost zone. In the continuous permafrost zone, permafrost underlies the surface of the ground everywhere; and there is certainty that anyone drilling or excavating below the surface to a substantial depth at any point will encounter permafrost. In the discontinuous permafrost zone, permafrost underlies the surface of the ground at most places but not everywhere; and there is better than a 50 percent probability that anyone drilling or excavating below the surface to a substantial depth at any point, without previous subsurface exploration, will encounter permafrost. In the sporadic permafrost zone, permafrost underlies the surface of the ground at some places but not at most places; and there is less than a 50 percent chance that anyone drilling or excavating below the surface to a substantial depth at any point, without previous subsurface exploration, will encounter permafrost.
(b) Permafrost may be found in all types of soils, but some are more susceptible to permafrost than others. For example, silt is more susceptible to permafrost than is sand, and sand is more susceptible than gravel.
(c) In the discontinuous permafrost zone or in the sporadic permafrost zone, permafrost may exist in the form of a stratum or in the form of a pocket. The evidence does not show the average thickness of the strata or pockets of *729 the permafrost in the vicinity of the Ladd Air Force Base, or the average depth at which permafrost is encountered.
(d) In the discontinous permafrost zone or in the sporadic permafrost zone, neither the existence nor the depth of permafrost below the surface of the ground can be predicted with certainty on the basis of an examination of the surface.
(e) Permafrost, when encountered in the vicinity of the Ladd Air Force Base, is much more difficult and expensive to excavate than the unfrozen alluvial soils of the area.
4. (a) Permafrost is to be distinguished from seasonal frost, which is ground that is frozen in the cold-weather months but does not remain permanently frozen.
(b) In midwinter (e.g., in early February), the ground in the area of the Ladd Air Force Base is frozen everywhere in the form of seasonal frost at the surface and down to a depth of a few feet. By early June, the seasonal frost has thawed to some extent at and near the surface, but the thawing of the seasonal frost has not been completed as of that time.
5. On the flood plain of the Tanana River, the ground water table is encountered at a depth of from 10 to 15 feet below the surface of the ground, wherever permafrost does not exist.
6. (a) In connection with the invitation for bids referred to in finding 1, the defendant furnished to prospective bidders written data in the form of profile drawings and related legends that purported to show the results of 33 test borings that had been accomplished by the defendant for the purpose of ascertaining subsurface conditions at the Ladd Air Force Base. One of the prospective bidders receiving such data was Morrison-Khudsen Co., Inc. (which will usually be referred to hereafter in the findings as “the plaintiff”). Of particular interest with respect to the present litigation were the defendant’s written representations to prospective bidders concerning the test borings that are mentioned in the remaining paragraphs of this finding.[6]
*730 (b) The written data relative to drill hole 260 furnished by the defendant to prospective bidders indicated (among other things) that this hole had been drilled on February 2, 1953; that the hole had been drilled at a point on the southeastern edge of the prospective excavation limits for L-3 and L-4; that it had gone to a depth of 30 feet from the surface of the ground; that the ground was unfrozen throughout the 30-foot depth of the hole (i.e., that no seasonal frost or permafrost had been encountered); and that no ground water table had been encountered.
(c) The written data relative to boring 1318 furnished by the defendant to prospective bidders indicated (among other things) that this boring had been done during the period November 17-21,1952; that it had been located at the east end of the prospective excavation for L-3 and L-4, and slightly to the north of drill hole 260; that it had gone to a depth of 14% feet; that permafrost had been encountered at a depth of 10 feet below the surface of the ground; and that the permafrost had continued to the bottom of the boring.
(d) The written data relative to boring 1128 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3,1952; that it had been located approximately 500 feet southwest of the site for L-3 and L-4; that it had gone to a depth of 12% feet; that permafrost had been encountered at a depth of 12 feet below the surface of the ground; and that the permafrost had extended to the bottom of the boring.
(e) The written data relative to boring 1129 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3,1952; that it had been located approximately 300 feet southeast of the site for L-3 and L-4; that it had gone to a depth of 16 feet; and that no permafrost had been encountered.
(f) The written data relative to boring 1130 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3,1952; that it had been located approximately 600 feet southeast of the site for L-3 and L-4; that it had gone to a depth of 16 feet; and that no permafrost had been encountered.
*731 (g) The written data relative to drill hole 261 furnished by the defendant to prospective bidders indicated (among other things) that this hole had been drilled on February 10, 1953; that it had been located within the limits, and at the east end, of the prospective excavation for L-5 and L-6; that it had gone to a depth of 30 feet; that the ground was unfrozen throughout the 30-foot depth of the hole (i.e., that no seasonal frost or permafrost had been encountered); and that no ground water table had been encountered.
(h) The written data relative to boring 1320 furnished by the defendant to prospective bidders indicated (among other things) that it had been done during the period November 17-21, 1952; that it had been located adjacent to, and just northwest of, the site for L-5 and L-6, at about the top of the slope, or perhaps a little beyond the top of the slope, of the prospective excavation; that it had gone to a depth of 15 feet; that permafrost had been encountered at a depth of 10 feet below the surface of the ground; and that the permafrost had extended to the bottom of the boring.
(i) The written data relative to boring 1125 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3, 1952; that it had been located about 100 feet south of the site for L-5 and L-6; that it had gone to a depth of 13 y2 feet; that permafrost had been encountered at a depth of about 6 feet below the surface of the ground; and that the permafrost had extended on down to the bottom of the boring.
(j) The written data relative to boring 1124 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3,1952; that it had been located approximately 300 feet southwest of the site for L-5 and L-6; that it had gone to a depth of 16 feet; and that no pennaf rost had been encountered.
(k) The written data relative to boring 1126 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3, 1952; that it had been located approximately 400 feet southeast of the site for L-5 and L-6; that it had gone to a depth of 15 feet; and that no permafrost had been encountered.
*732 (l) The written data relative to boring 1123 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3, 1952; that it had been located approximately 600 feet southwest of the site for L-5 and L-6; that it had gone to a depth of 15 feet; and that no permafrost had been encountered.
(m) The written data relative to boring 1127 furnished by the defendant to prospective bidders indicated (among other things) that it had been done on October 3, 1952; that it had been located in the 1,750-foot intervening area between the site for L-3 and L-4 and the site for L-5 and L-6; that it had gone to a depth of 15 feet; that permafrost had been encountered at a depth of about 14 feet; and that the permafrost had extended to the bottom of the boring.
(n) The written data relative to boring 1317 furnished by the defendant to prospective bidders indicated (among other things) that it had been done during the period November 17-21, 1952; that it had been located within the 1,750-foot intervening area between the site for L-3 and L-4 and the site for L-5 and L-6; that it had gone to a depth of approximately 15 feet; that permafrost had been encountered at a depth of about 14 feet below the surface of the ground; and that the permafrost had extended to the bottom of the boring.
(o) The written data relative to boring 1319 furnished by the defendant to prospective bidders indicated (among other things) that it had been done during the period November 17-21,1952; that it had been located approximately 750 feet northeast of the site for L-5 and L-6, and approximately 1,000 feet northwest of the site for L-3 and L-4; that it had gone to a depth of 14 feet; that permafrost had been encountered at a depth of about 13% feet; and that the permafrost had extended to the bottom of the boring.
(p) The written data relative to boring 1321 furnished by the defendant to prospective bidders indicated (among other things) that it had been done during the period November 17-21, 1952; that it had been located approximately 750 feet southeast of the site for L-5 and L-6, and approximately 1,100 feet southwest of the site for L-3 and L-4; that it had gone to a depth of about 14% feet; that perma *733 frost bad been encountered at a depth of 14 feet; and that the permafrost had extended to the bottom of the boring.
7. (a) In the area of the Ladd Air Force Base, when permafrost is encountered in a test boring at a certain depth, it can reasonably be presumed that permafrost also exists at the same depth in the ground extending outward in all directions from the boring for a distance of about 10 feet. Such a discovery, however, cannot be accepted as providing a basis for a reasonable presumption concerning the existence of permafrost at a distance of more than 10 feet from the boring.
(b) Similiarly, when permafrost is not encountered in a test boring, it can reasonably be presumed that no permafrost exists in the ground extending outward in all directions from the boring for a distance of about 10 feet. However, the lack of permafrost in the boring cannot be accepted as the basis for a reasonable presumption regarding the lack of permafrost at a distance of more than 10 feet from the boring.
(c) When permafrost is discovered in a test boring and the permafrost extends to the bottom of the boring, this does not provide any reasonably accurate indication as to how far — if at all — the permafrost extends downward below the bottom of the boring.
8. (a) Some of the information which the defendant gave prospective biddders, including the plaintiff, concerning the subsurface conditions purportedly discovered through the drilling of holes 260 and 261 (see paragraphs (b) and (g) of finding 6) was incorrect. Actually, the defendant had encountered both seasonal frost and permafrost in drilling holes 260 and 261, as indicated in paragraphs (b) and (c) of this finding.
(b) In drilling hole 260, the defendant had first encountered seasonal frost, which extended from the surface of the ground down to a depth of 5 feet. The defendant had next encountered a thawed stratum that was 7 feet in thickness. Then, at a depth of 12 feet below the surface of the ground, the defendant had encountered permafrost, which extended from the 12-foot level down to the bottom of the hole at a depth of 30 feet.
*734 (c) In drilling hole 261, the defendant had encountered seasonal frost at the surface of the ground, and it had extended down to a depth of 5 feet. Below that, there was a thawed stratum 2 feet in thickness. Next, there was permafrost, beginning 7 feet below the surface of the ground and extending down to the bottom of the hole at a depth of 30 feet.
(d) The evidence in the whole record warrants the inference that the defendant, in furnishing to prospective bidders incorrect information relative to the purported failure to encounter seasonal frost and permafrost in drilling holes 260 and 261, was not motivated by any intention to deceive prospective bidders, but that the incorrect information concerning these matters was furnished to prospective bidders through negligence.
9. The original logs relative to the drilling of holes 260 and 261, showing correctly the subsurface information developed in connection with the drilling of these holes, as indicated in finding 8, were maintained in the Office of the District Engineer at Anchorage, Alaska, and were available for examination by any person interested in submitting a bid in response to the invitation for bids referred to in finding 1.
10. (a) The plaintiff was the low bidder on all the items referred to in the invitation for bids (see finding 1), at an estimated total price of $2,165,532. The plaintiff’s bid was accepted; and a contract (No. DA-95-507-eng-569) was entered into by the plaintiff and the defendant on October 14, 1953. The work was to be completed in accordance with the terms of the contract not later than March 22, 1955. (This contract will usually be referred to hereafter in the findings as “the contract.”)
(b) The plaintiff’s unit-price bid for Item 1 of the contract (see finding 1 (b) ) was 81 cents per cubic yard.
(c) Vice President Ericson was the official of the plaintiff corporation who was in charge of the work of preparing and submitting the plaintiff’s bid on the contract.
11. (a) The contract contained the following “General Provisions” (among others):
*735 2. SPECIFICATIONS AND DRAWINGS. — The contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the contracting officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of differences between drawings and specifications, the specifications shall govern. In any case of difference in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the contracting officer who shall promptly make a determination in writing. Any adjustment by the contractor without this determination shall be at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.
¥ ^ $
4. CHANGED CONDITIONS. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
*****
6. DISPUTES. — Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the Contractor at his address shown herein. Within *736 30 days from, the receipt thereof, the Contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless within 30 days after the receipt thereof by the Contractor, he appeals in writing to the Secretary, which appeal shall operate to vacate said decision of the Chief of Engineers.. If the dispute is determined by the Secretary, his written decision, or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary may designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this article. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision. Notwithstanding the provisions of this clause, the Contractor shall have such right of appeal to the Court of Claims as is provided by Section 635, Public Law 488,82nd Congress.
* ❖ ‡ # #
11. PERMITS AND RESPONSIBILITY FOR WORK. — The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance except for any completed unit thereof which may theretofore have been finally accepted.
(b) The “Description of Work” in the contract ■ was phrased in the following language:
a. Work to be Done: (See Article I of the Contract). The work consists of furnishing all plant, labor, materials and equipment, and performing all work in strict accordance with those specifications and schedules and drawings forming parts thereof, for the Construction and Installation of Bulk Liquid Fuels Storage, Transfer *737 and Hydrant Refueling Facilities and Appurtenance at Ladd Air Force Base, Alaska.
b. Location: The site of the proposed work is at Ladd Air Force Base near Fairbanks, Alaska, as shown on the plot plan.
(1) The Contractor is required to schedule his operations in such a manner that upon suspension of work during the winter months, the roads, taxiways, aprons and shoulders adjacent to his operations are both smooth and clear of all obstructions, as no condition hazardous to the operation of aircraft, or to general base operations will be permitted during the time construction work is suspended.
(c) The contract contained the following “General Conditions” (among others) :
GC-3 SITE INVESTIGATION AND REPRESENTATIONS : The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling, and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, river stages, tides, or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under this contract. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that the responsibility therefor is assumed by the Government. Representations *738 made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor.
ifc % % * *
GC-6 SUBCONTRACTORS: At the request of the Contracting Officer the Contractor shall notify the Contracting- Officer in writing of the names of all subcontractors proposed for the work, together with the extent and character of the work to be done by each subcontractor. The Contractor or subcontractor shall, within 7 days after the making of any subcontract, deliver to the Contracting Officer an affidavit setting forth the name and address of his subcontractor and a summary description of the precise work subcontracted. If for sufficient reason, at any time during the progress of the work, the Contracting Officer determines that any subcontractor is incompetent or undesirable, he will notify the Contractor accordingly and immediate steps will be taken for cancellation of such subcontract. Subletting by subcontractors shall be subject to the same regulations. Nothing contained in this contract shall create any contractual relation between the subcontractor and the Government.
(d) The contract contained the following “Special Conditions” (among others) :
SC-2 DRAWINGS: Contract Drawings, Maps and /Specifications: Not to exceed a total of 25 sets of contract drawings maps and specifications will be furnished the Contractor without charge. If additional sets are required they will be furnished at the cost of reproduction. The work shall conform to the following drawings, all of which form a part of these specifications and are available in the Office of the District Engineer, Alaska District, Anchorage, Alaska. In case of a difference between the Technical Provisions and Special Conditions the latter shall govern; in case of a difference between the small-scale and large-scale drawings the latter shall govern; in case of a difference between scaled and given dimensions the latter shall govern; in case of a difference in the drawings and the schedules as shown on the drawings the latter shall govern; and in case of a difference between the drawings and the written specifications the latter shall govern.
*739 SC-17 PHYSICAL DATA: Information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn therefrom by the Contractor.
a. Sub-surface Conditions: This base is located in an area in which frost-susceptible materials and permafrost are frequently encountered. The area is underlain by a deep alluvium of river deposits in varying strata, the soils being primarily of glacial origin. Sub-surface investigations near the site have disclosed that either or both frost-susceptible soils and permafrost may be found beneath the existing surface.
b. Weather Conditions: The climate in the jobsite area is typical of the interior portions of Alaska, with long and severely-cold winters and short, warm summers with very long daylight hours. Pertinent weather data taken from compilations of the U.S. Weather Bureau for Fair-Banks, which is in this area, are as follows:
Mean Maximum Temperature_36.2 degrees F.
Mean Minimum Temperature_15.2 degrees F.
Highest Recorded Temp. (July 1919)_99 degrees F.
Lowest Recorded Temp. (January 1931) — —66 degrees F.
Average Annual Precipitation_ 12.30 inches.
Average Annual Snowfall_60.6 inches.
Average Wind Velocity_5.1 MPH.
Maximum Recorded Wind Velocity_46 MPH.
Prevailing Wind Direction_ NNW.
e. Ground Water: A condition of high ground water exists in this area.
& ijs Jfs $
SC-23 CONTRACT BID BREAKDOWN: The Contractor shall furnish, within 30 days after the award of contract and prior to the submission of his first partial-payment estimate, a breakdown of his lump-sum bid which will be reviewed by the Contracting Officer as to propriety of distribution of the total cost to the various accounts. Any unbalanced items as between early and late payment items or other discrepancies will be revised by the Contracting Officer to agree with a reasonable cost of the work included in the various items. This contract bid breakdown will then be utilized as the basis for progress payments to the Contractor.
sfc ¡f- íJí íf*
SC-32 ESTIMATED QUANTITIES: The quantities listed in the Unit Price Schedule are estimates *740 only. The Contractor will be required to complete the work specified herein in accordance with the contract and at the contract price or prices whether it involves quantities greater or less than the estimated quantities; provided that, should the actual quantity of work performed under any item vary from the estimated quantity by more than 25%, an adjustment in the unit price for any such item shall be made on the following basis. Where the actual quantities of work for an item exceed by more than 25% the estimated quantities stated in this contract for such item either party to this contract may make a demand for negotiation for a new unit price for the actual quantity of work that is in excess of the estimated quantity plus 25% thereof. Where the actual final quantity of work for an item is less than the estimated quantity stated in the contract by more than 25%, the Contractor will be paid at the contract unit price for that item for the actual quantities of work performed and, in addition, may request compensation in an amount sufficient to provide a reasonable allowance for the loss of indirect costs on the quantity of work represented by the difference between the actual quantity and the estimated quantity of work less 25% thereof. In the event of a dispute as to the amount of any adjustment under this paragraph the matter shall be treated as a question of fact to be determined in accordance with the “Disputes” articles of this contract.
(e) The contract contained the following “Technical Provisions” (among others):
1-03 DEFINITIONS:
a. Non-Frost Susceptible Soils: Non-frost susceptible soils are defined as inorganic soils containing less than 3 percent of grains finer than 0.02 mm by weight.
b. Classified Fill and BacJcfill: Classified fill and back-fill shall be non-frost susceptible material consisting of well graded broken stone, sand, gravel or other materials as approved by the Contracting Officer which may be obtained from the designated areas or by selection from the excavation. All materials shall be free of frozen lumps. Fill is considered to be material placed above the original ground line whereas backfill is considered to be material placed in an excavation.
o. Unclassified Fill and BacJcfill: Unclassified fill and backfill shall consist of the excavation, or borrow of sand, gravel or other materials including frost susceptible materials approved by the Contracting Officer, and *741 shall be free of frozen lumps, trash, lumber, or other debris.
* ¡¡= * * S:
1-05 SUBSURFACE INVESTIGATIONS: Ex-
Elorations consisting of drill holes and/or test pits have een made at the sites of structures. The locations and soil logs of the explorations are shown on the contract drawings to assist the contractor in ascertaining the character of the excavation material to be encountered. However, the Government does not guarantee that materials other than those disclosed by the explorations will not be encountered, or that the proportions of the various materials will not vary from those indicated by the logs of the explorations. Additional data on subsurface conditions are available for review in the Office of the Alaska District Engineer.
1-06 EXCAVATION:,
a. General: The site indicated on the drawings shall be cleared of all natural obstructions and existing foundations, pavements, utility lines, and other items which will interfere with the construction operations. Excavation of every description and of whatever substances encountered shall be performed to the dimensions, elevations and lines indicated on the drawings for each building and structure, except as specified below. No additional payment will be made for excavations made for utility systems inside the vertical paylines established for structural or for tank excavations, but will be considered as a subsidiary obligation to such excavations. Rock will be encountered in excavations in the bulk storage and transfer facilities area. The extent of excavation for the removal of undesirable materials, such as frost susceptible materials, has been determined from the results of the explorations and has been shown on the drawings as an approximate excavation line. If, in the opinion of the Contracting Officer, suitable soil conditions (such as non-frost susceptible materials) are encountered at different elevations from those indicated on the drawings, the Contracting Officer may direct in writing that the excavation be carried to elevations of lines above or below those indicated on the drawings. Any excavation beyond the authorized dimensions, elevations and lines shall be backfilled with suitable compacted material without cost to the Government. Excavation shall extend to a vertical line as shown on the drawings outside the projected exterior wall line to allow for placing and removal of forms, installation of services, and for inspection. Undercutting will not be permitted. *742 Suitable excavated material, which, is required for classified fill and backfill, shall be separately stock-piled as directed by the Contracting Officer.
b. Drainage in Vicinity of Buildings and Other Structures: The contractor shall control the grading in the vicinity of buildings and other structures so that the surface of the ground will be properly sloped to prevent water from running into the excavated areas. Any water which accumulates in the excavation shall be removed promptly. All excavations below the ground water level shall be dewatered.
c. Shoring j Such shoring, including sheet piling, as may be required during excavation shall be installed to protect the banks, adjacent paving, workmen, structures, and utilities. Where in the opinion of the Contracting Officer damage may result from withdrawing sheathing, the sheathing will be required to be left in place.
d. Excess Material: Excess material from excavation, not required for fill or backfill, shall be wasted where indicated on the drawings. Wasted material shall be spread and leveled or graded, as directed by the Contracting Officer.
e. Removal of Utilities: When utility lines are encountered within the area of operations, the contractor shall notify the Contracting Officer in ample time for the necessary measures to be taken to prevent interruption of the service. Inactive or abandoned utilities shall be removed and the remaining ends capped outside the building site.
/. Site Grading: Site grading comprises that type of work commonly referred to as “site grading” or “over-lot grading”, and excavation therefor shall consist of the removal of all materials to the lines and grades indicated on the drawings or as directed by the Contracting Officer. No special consideration will be given to whether or not frost-susceptible material exists in the subgrade for site grading and its removal therefrom will not be required. The finished surface shall be reasonably smooth and free from irregular surface changes. The degree of finish shall be that ordinarily obtainable from either blade-grader or scraper operations. Site grading shall include the clearing of sites as a subsidiary obligation to the work performed.
1-07 FILLING AND BACKFILLING:
a. Classified Fill and Backfill: Where classified fill or backfill is shown on the drawings or is required by the Contracting Officer, such fill shall consist of material as hereinbefore specified and it shall be placed in layers not *743 exceeding 8 indies in thickness, and not exceeding thicknesses required where other thicknesses are specified. Each layer shall be compacted to at least 95 per cent, or to 100 per cent where so specified, of maximum density with a roller of a type approved 'by the Contracting Officer. Where classified fill or backfill extends below the footings, it shall also extend to a vertical line 3 feet outside the projected exterior wall line.
b. Unclassified Fill and Backfill: After completion of foundation footings, and other construction below the elevation of the final grades, and prior to backfilling, all forms shall be removed and the excavation shall be cleaned of all trash and debris. Backfill or fill shall be unclassified, where indicated on the drawings, and it shall be placed in horizontal layers not in excess of 8 inches in thickness. Each layer shall be compacted by hand or machine tampers or by other suitable equipment to at least 90 per cent of maximum density. Backfill shall be brought to a suitable elevation above grade to provide for anticipated settlement and shrinkage thereof.
e. Backfill About Underground Tcmks: Backfill about underground tanks shall be pit-run gravel, compacted to 95 per cent of maximum density to the height of the centers thereof. The remainder of backfill except under buildings, shall be of unclassified materials.
* $ * # #
1-14 METHODS OF MEASUREMENT:
a. Excmaiion, Structural and Excmation In Rock: The unit of measurement for excavation shall be the cubic yard, computed by the average end area method, from cross sections taken before and after excavation operations. The yardage to be paid for shall be'the number of cubic yards of material, measured in the original position, suitably removed for structures in bulk storage and fuel transfer areas; the bulk storage tanks; control gits; and all tanks, structures, and pits located within iperational Storage Increments L-l, L-2, L-3, L-4, L-5, and L-6. The measurement will not include the yardage excavated without authorization beyond the depths and pay lines indicated on the drawings nor the yardage of any material excavated before the taking of cross-sectional measurements of undisturbed grade, but will include the yardage of unsuitabale material below pay depths which is removed at the specific direction of the Contracting Officer. The final cross-sectional area measured will not include water or other liquid but will *744 include mud, muck, and similar semisolid matter which cannot be drained away and which has not been disturbed by the Contractor before the taking of cross-sectional measurements.
5. Classified Fill a/nd Backfill for Structu/res: The yardage of classified fill and backfill for structures to be paid for shall be the number of cubic yards of ap-
E roved material, measured in its final position, computed y the average end area method, placed to the lines and grades shown, and compacted as specified, for structures m bulk storage and fuel transfer areas; subgrade fill for bulk storage tanks; control pits; and all structures and pits within the Operational Storage Increments L-l, L-2, L-3, L-4. L-5, and L-6.
c. Unclassified Fill a/nd Backfill for Structures: The yardage of unclassified fill and backfill for structures to be paid for shall be the number of cubic yards of material, measured in its final position, computed by the average end area method, placed to the lines and grades shown, and compacted as specified for structures, tanks, and pits, within fuel transfer area and Operational Storage Increments L-l, L-2, L-3, L-4, L-5, and L-6.
‡ % $ sji #
1-15 PAYMENT:
a.Excavation, Structural and Excavation in Bock: The yardage of structural excavation, according to kind as indicated in the Unit Price Schedule, determined as specified in Paragraph l-14a, will be paid for at the contract unit price per cubic yard therefor, which payment shall constitute full compensation for all labor, equipment, tools, supplies, and incidentals to complete all items of the work, including removal of excess and unsuitable material, hauling, stockpiling or disposal of excavated material, stripping of sites, drainage and de-watering, shoring, and removal of utilities, as indicated on the drawings and specified herein.
b.Classified Fill and Backfill for Structures: The yardage or classified fill and backfill for structures, determined as specified in Paragraph l-14b, will be paid for at the contract unit price per cubic yard therefor, which payment shall constitute full compensation for all labor, equipment, tools, supplies, and incidentals to complete all items of the work, including selecting, hauling, placing, and compacting the classified material as indicated on the drawings and specified herein.
c.Unclassified Fill and Backfill for Structures: The yardage of unclassified fill and backfill for structures, *745 determined as specified in Paragraph l-14c, will be paid for at the contract unit price per cubic yard therefor, which payment shall constitute full compensation for all labor, equipment, tools, supplies and incidentals to complete all items of the work, including placing and compacting unclassified material as indicated on the drawings and specified herein.
(f) The contract did not contain any specifications or other provisions governing the methods to be used in removing permafrost.
12. The plaintiff did not, in connection with the preparation and submission of its bid on the contract, inquire of the defendant as to why the data relative to drill holes 260 and 261 furnished by the defendant to prospective bidders failed to show the existence of seasonal frost at the time when the holes were drilled, or as to why such data failed to show the existence either of permafrost or of the ground water table within the 30-foot depth of such holes. The evidence warrants the inference that if such an inquiry had been made, it would have resulted in the disclosure to the plaintiff that certain of the data furnished by the defendant to prospective bidders concerning drill holes 260 and 261 were incorrect, and that both seasonal frost and permafrost had actually been encountered in the drilling of such holes, as indicated in finding 8.
13. The plaintiff, when it prepared and submitted its bid on the contract and entered into the contract, had gained through experience general knowledge of the widespread, though discontinuous, existence of permafrost in the area of the Ladd Air Force Base; it was further aware of the existence everywhere in that area of seasonal frost in midwinter; and it was also aware of the existence of the ground water table fairly close to the surface, wherever permafrost does not exist.
14. (a) At the time when the plaintiff prepared and submitted its bid on the contract, the plaintiff intended to perform the structural excavation work under Item 1 of the contract, and did not intend to subcontract this part of the contract. Later, however, the plaintiff did subcontract the structural excavation work under Item 1 of the contract *746 (along with, certain other items of work) to the Williams Construction Co., a joint venture composed of the Williams Equipment Co. and Sidney Kent. (This joint venture will usually be referred to hereafter in the findings as “the subcontractor.”)
(b) The subcontract between the plaintiff and the subcontractor provided in part as follows:
Article I. Performance of Work.
The Subcontractor shall furnish all materials, supplies and equipment, except as otherwise herein provided, and perform all labor required for the completion of the said work in accordance with all provisions of the original contract and of the specifications and plans referred to therein, all of which are hereby made a part of this agreement, and under the direction and to the satisfaction of the Principal’s engineer or other authorized representative in charge of said work. The Subcontractor’s employees shall not exceed the number required to do the work efficiently and within the time specified herein for the completion of the work, and the wages received by them shall be the same as that paid up by the Contractor for similar work.
$ ‡ $
Article III. Changes in the Original Contract.
It is mutually agreed and understood that the Contractor is not an insurer or guarantor of the said work or of any part thereof, or of the performance by the Principal of the original contract as specified therein or otherwise, and that the Subcontractor shall be bound by any changes or alterations made by the Principal in the said original contract, specifications or plans, or in the amount or character of said work or any part thereof, to the same extent that the Contractor is bound thereby.
% # H* sj« af;
Article X. Settlement of Controversies.
The Subcontractor agrees that if any controversy arises between Subcontractor or the Contractor and the Principal in respect to the amount, quantity, kind, classifications, price, or value of the work performed or to be performed by the Subcontractor, or in respect to the kind, character, condition, suitability, utility, price, or value of any material or supplies furnished or to be furnished by the Subcontractor, or the proper interpretation of the plans, specifications, or original *747 contract, or in respect to any alleged delay or delays in the prosecution or completion of the work made or caused to be made by the Principal, or in respect to any kind of labor or maimer of performance thereof, or in respect to any other matter or thing pertaining to or connected with the work provided for herein, the Contractor may, in its discretion, compromise and settle the same with the Principal, and the tender to the Subcontractor of the amount due or to become due to him under and according to said compromise and settlement shall operate to release the Contractor and the Principal and their property and the structure or structures or other works covered by the original contract, and the whole thereof, and the surety of the Contractor from liability to the Subcontractor for any sum of money or damages in excess of the amount so tendered and subject to special conditions.
‡ ‡ $
Article XIY. Claims for Extra Work or Damages.
The Contractor will pay for extra work performed and materials furnished by the Subcontractor, under written authorization by the Principal’s engineer, the actual cost thereof plus a percentage of said cost equal to one-half the percentage received by the Contractor, as and when it is paid therefor by the Principal. Any claim of the Subcontractor for extra work and/or materials not so authorized, or for damages of any nature whatsoever, shall be deemed waived by Subcontractor unless written notice thereof is given the Contractor ■ within ten days after the date of its origin.
It is distinctly understood and agreed 'by Subcontractor that this agreement is made for the consideration herein named, and that the Subcontractor has, by examination, satisfied himself as to the nature and location of the work, the character, quantity and kind of materials to be encountered, the character, kind and quantity of equipment needed during the prosecution of the work, the location, conditions and other matters which can in any manner affect the work under this agreement. * * *
Article XXI. Special Provisions.
*****
8. All dewatering in connection with this work shall be done by the General Contractor.
9. The Subcontractor will do no hand excavation or hand backfilling.
*748 10. The Subcontractor will do all necessary machine and hand compaction on Items 3 and 4, with the rent-free and maintained Jackson Compactors furnished by the General Contractor.
* * * * *
13. All engineering and layout will be done by the Prime Contractor, and the engineering records made by the Prime Contractor or Owner will be made available to the Subcontractor at all times. Should it become necessary to make field changes of alignment or grade such changes shall be made with the collaboration of the Subcontractor.
14. In the event estimated quantities are either increased or decreased beyond the 25% established by the contract specifications thus requiring renegotiating of unit prices, this Subcontractor is to participate in such renegotiation of unit prices and quantities.
(c) The subcontract between the plaintiff and the subcontractor fixed a unit price of 68 cents per cubic yard for the estimated 35,500 cubic yards of structural excavation work under Item 1 of the contract. (This subcontract will usually be referred to hereafter in the findings as “the subcontract.”)
(d) In negotiating the subcontract, the plaintiff furnished to the subcontractor the information which had been received from the defendant relative to subsurface conditions, as indicated in finding 6.
15.(a) The subcontractor began the work of excavating at the site of Increments L-3 and L-4 on June 3, 1954, and it began the excavation at the site of Increments L-5 and L-6 on June 5, 1954. At each site, the subcontractor first encountered a layer of unfrozen ground, as the seasonal frost had thawed to some extent. The top layer of unfrozen ground was about 1 foot thick at L-3 and L-4, and it varied in thickness from about 1 foot to about 16 inches at L-5 and L-6. Below the top layer of unfrozen ground, the subcontractor encountered at each site a stratum of seasonal frost, which was from 2 to 2% feet thick at L-3 and L-4 and was from 2% to 3 feet in thickness at L-5 and L-6. Immediately below the stratum of seasonal frost at each site was a second layer of unfrozen ground. The encountering of seasonal frost at the two sites was not unexpected to the subcontractor, and the excavation of the seasonal frost did not cause the sub *749 contractor any particular difficulty. It was broken up and removed with the aid of the same equipment that the subcontractor used in loosening and removing the unfrozen ground immediately above and immediately below the stratum of seasonal frost, i.e., a bulldozer and ripper and a drag-line.
(b) On June 9,1954, as the subcontractor was excavating at the two sites referred to in paragraph (a) of this finding, it encountered permafrost at each of the two sites.[7] In excavating L-5 and L-6, the permafrost was encountered at an average depth of about 7 feet below the surface of the ground; and, as it was later discovered, the permafrost extended to the bottom of this excavation. The permafrost in the excavation at L-3 and L-4 was encountered at an average depth of about 10 feet below the surface of the ground; and it extended downward to the bottom of the excavation.,
(c) When permafrost was first encountered in excavating at the site of L-3 and L-4 and at the site of L-5 and L-6, the subcontractor endeavored to cope with the permafrost by using the equipment that was then working in each excavation, i.e., the bulldozer and ripper and the dragline. An attempt was made to rip the permafrost, assemble the broken pieces with the bulldozer, and then remove this material with the dragline. Progress was so slow, however, that the subcontractor soon concluded that the only feasible method of breaking the permafrost within the available time was to blast it. Preparations for blasting were begun on June 10, 1954. This involved the assembling of additional equipment — such as drills, compressors, trucks, and powder magazines — and also additional manpower. The preparations had been completed by June 14,1954, and blasting was begun on that date. In the meantime, the subcontractor had continued its efforts to remove the permafrost in each excavation with the aid of a bulldozer and ripper and a dragline, but only slight progress had been made. There was also some thawing of the permafrost, due to exposure to the sun, during this interval.
(d) Beginning on June 14, 1954, blasting was used exclusively as the means of breaking up the permafrost in *750 the two excavations previously mentioned, until tlie subcontractor reached a point some 2 or 3 feet above the bottom of each excavation. The holes for the blasting were drilled in the permafrost to a depth of 5 or 6 feet; and then, after each “shot” in an excavation, a bulldozer and a dragline were moved to the site for the purpose of assembling and removing the pieces of permafrost broken by the blast. Because of the proximity of an aircraft runway to each excavation, the defendant regulated the timing of, and the amount of powder used in, the various “shots,” so as to avoid interference with air traffic. This caused some delay to the subcontractor in connection with the excavation of the permafrost.
(e) The last 2 or 3 feet of permafrost in each of the excavations previously mentioned was ripped loose and then removed, instead of being blasted.
(f) The excavation work at L-3 and L-4 was completed by the subcontractor on July 19, 1954, and the excavation work at L-5 and L-6 was completed by the subcontractor on July 27,1954.
(g) In excavating at the site for Increments L-3 and L-4, the subcontractor was required to excavate approximately 2,709 cubic yards of permafrost; and the subcontractor was required to excavate approximately 3,255 cubic yards of permafrost in excavating at the site for Increments L-5 and L-6. Thus, the subcontractor excavated a total of approximately 5,964 cubic yards of permafrost in performing the excavation work at the sites for Increments L-3 and L-4 and Increments L-5 and L-6. The permafrost comprised approximately 66 percent of the total material (about 9,036 cubic yards) excavated at these two sites.
16. The unexpected discovery of permafrost in excavating the two sites mentioned in finding 15 caused the subcontractor further trouble, in addition to the difficulties mentioned in finding 15. When permafrost was exposed on the side slopes of each excavation, the permafrost began to thaw following exposure, and the newly thawed material in the side slopes tended to slough or ravel and slide into the excavation. It had been the plan of the subcontractor to dig each excavation at a slope ratio of y2-to-1 (i.e., % foot horizontal to 1 *751 foot vertical); but when the sloughage or raveling developed, the defendant issued a directive requiring that the slope ratio be flattened to 1-to-l. This increased the amount of work that the subcontractor had expected to do.[8]
17. The reasonable extra cost of removing the permafrost from the excavations at the sites for Increments L-3 and L-4 and Increments L-5 and L-6, over and above the reasonable cost of removing an equivalent quantity of unfrozen ground at the two sites, amounted to approximately $4.20 per cubic yard.
18. Under the date of June 18,1954, the plaintiff advised the Resident Engineer of the Corps of Engineers in writing that permafrost had been encountered. The plaintiff’s communication stated in part as follows:
This is to advise you that the Contractor has encountered extensive permafrost in areas not indicated on the contract drawings in excavation of Increments LI, L3 and L4, L5 and L6.
The Contractor requests an examination, by the Resident Engineer, of the changed conditions, so that an equitable adjustment in the contract can be initiated.
19. An investigation was made by personnel of the Corps of Engineers, and this confirmed the encountering of permafrost.
20. Under the date of July 29,1954, the plaintiff submitted to the Resident Engineer of the Corps of Engineers a claim “for extra cost incurred due to the existence of permafrost in Increments LI, L3 and L4, L5 and L6.” The claim was for the total amount of $182,806.81.
21. Under the date of November 22, 1954, the contracting officer rendered his written decision on the plaintiff’s claim, stating in part as follows:
* * * [I]t is my decision as Contracting Officer that the claim of the Contractor for an increase to the price of his contract because he encountered permafrost in his excavation be and is herewith denied and any costs incurred by the Contractor in this matter is for his account.
22. On December 6, 1954, the plaintiff appealed to the Chief of Engineers from the contracting officer’s decision of *752 November 22, 1954. The appeal was referred to the Corps of Engineers Claims and Appeals Board, as the Chief of Engineer’s authorized representative for the determination of such matters, and it was assigned the number Engineers C&A Board No. 1061.
23. Under the date of May 11, 1955, the contracting officer made a set of findings in connection with his decision of November 22, 1954. The record before the court does not disclose upon what evidence the contracting officer based his findings.
24. Under the date of April 17,1956, the contracting officer made some supplemental findings. The record before the court does not disclose upon what evidence the contracting officer based the supplemental findings.
25. (a) After a 3-day hearing, which resulted in a 501-page transcript and numerous exhibits, was held in Anchorage, Alaska, during the period March 21-23,1957, the Corps of Engineers Claims and Appeals Board on February 28, 1958, rendered a decision on the plaintiff’s appeal.
('b) The Corps of Engineers Claims and Appeals Board made the following findings:
a. Increment L-l. That the location of Boring 1322 as shown on Sheet 86 is approximately correct; that boring 1323 should be approximately 40 feet east of Boring 1322 and is therefore shown as being approximately 190 feet too far east; that Boring 1324 should be approximately 40 feet north of Boring 1322 and is therefore shown as being approximately 210 feet too far north; that Boring 1325 should be approximately 40 feet west of Boring 1322 and is therefore shown as being approximately 60 feet too far west; and that Boring 1326 should be approximately 40 feet south of Boring 1322 and is therefore shown as being approximately 720 feet too far south.
b. Increments L-3, L-4, L-5, and L-6. That the location of Boring 1317 as shown on Sheet 86 is approximately correct; that Boring 1318 should be approximately 40 feet east of Boring 1317 and is therefore shown as being approximately 1,060 feet too far east; that Boring 1319 should be approximately 40 feet north of Boring 1317 and is therefore shown as being approximately 170 feet too far north; that Boring 1320 should *753 be approximately 40 feet west of Boring 1317 and is therefore shown as 'being approximately 720 feet too far west; and that Boring 1321 should be approximately 40 feet south of Boring 1317 and is therefore shown as being approximately 410 feet too far south; that the original field logs for Boring L-DH 260 showed that frozen material was encountered at 0 to 5 feet and from 12% feet to the bottom of the Boring at 30 feet down which information was not included on the logs in the contract drawings; and that the original field logs for Boring L-DH 261 showed that frozen material was encountered at 0 to 5 feet and from 7 feet to the bottom of the boring at 30 feet down, which information was not included on the logs in the contract drawings.
Sheet 50 of 86 of the drawings, Structural, Increment L-l, Pump House, Plans, Sections & Details, shows the boring log of Boring 1322 with notation that “Soil logs used as basis for design are shown on this sht. See sht. 86 for location.” Sheet 52 of 86, Structural, Increments L-3, L-4, and L-5, L-6, Pump Houses, Plans & Details, contains the notation “Soil logs used as basis for design are shown on sht. 53. See sht. 86 for location.” Sheet 53 of 86, Structural, Increments L-3, L-4, and L-5, L-6, Pump Houses, Sections & Details, shows boring log of Boring 1317; however, it does not show the frozen material at 14 feet which is shown on the log of that boring on sheet 86. Sheet 86 shows a total of 34 boring logs, 8 of which show frozen materials other than on the surface. All 8 of the logs showing frozen materials are relatively near to the L-3, L-4, L-5, and L-6 increments, where a total of 15 of the 34 boring logs were taken.
* * * There is no question but that the cost of excavating frozen materials is considerably greater than that of excavating unfrozen materials.
(c) The decision of the Corps of Engineers Claims and Appeals Board then stated in part as follows:
Article 4 of the contract provides for relief in the form of a modification to the contract to provide for any increase or decrease of cost and/or difference in time resulting from the encountering of “subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications.” Under this provision bidders are en *754 titled to rely on information included in tbe plans and specifications and are entitled to an adjustment in price and time in the event actual conditions differ materially from those indicated.
Sheet 86 of 86 shows nine logs of borings within approximately 250 feet of the site of the work for Increment L-l. Another boring is shown 760 feet from the site and six more borings were shown at Increment L-2 some 2000 feet from the site. In none of these 16 borings was there shown any indication of permafrost. The nearest boring showing permafrost is Boring 1818 which is shown to be some 3200 feet from the site. Under such circumstances, it seems clear to the Board, and the Board so finds, that the encountering of permafrost at the Increment L-l site constituted a changed condition within the meaning of the last-cited provision of Article 4 of the contract.
At the sites for Increments L-3 and L-4 and L-5 and L-6 the situation is quite different. Of the 15 borings taken in the general area of these four increments 8 indicated that frozen materials extending to the bottom of the borings were encountered at various depths. Borings 1318 and 1320 are shown as being immediately adjacent to, and the nearest borings to, each site and show frozen materials as being encountered at 10 feet to bottom of borings. Borings L-DH 260 and L-DH 261 were shown as being the next nearest to the sites and are shown as being only slightly further from the sites than Borings 1318 and 1320. These two bor-ings failed to indicate thereon the information contained in the original field logs that frozen materials were actually encountered in the drilling. Appellant alleges that he gave more weight to Borings INDII 260 and 261 because they were taken subsequent to Borings 1318 and 1320. Since permafrost is a more or less permanently frozen material and its thawing from beneath the ground is a very slow process, the Board does not feel that Borings L-DH 260 and 261 can be given any additional significance over borings taken the same winter but a few months earlier. The boring logs shown on Sheet 86, taken as a whole, even though information as to permafrost encountered in taking the borings was inadvertently omitted from two of the logs shown on Sheet 86, clearly indicates to the Board that appellant should have expected to encounter permafrost in the excavation for the sites for Increments L-3, L-4, L-5 and L-6. *755 It is not denied by the Government that the location of the borings on Sheet 86 was in error. In fact, this Board has found that Boring 1318 was shown approximately 1,060 feet too far east and Boring 1320 was shown approximately 720 feet too far west. However, this claim under Article 4 is based on the actual conditions encountered differing materially from those indicated on the drawings. From the drawings the Board finds that appellant should have expected to encounter permafrost m the excavation for the pumphouse and tank sites for Increments L-3, L-4, L-5, and L-6.
The appeal is sustained insofar as it pertains to any permafrost encountered in the Increment L-l area and is denied insofar as it pertains to Increments L-3, L-4, L-5 and L-6. The appeal is remanded to the contracting officer for adjustment in accordance with this decision.
26. (a) Under the date of March 12, 1958, the plaintiff took an appeal to the Secretary of the Army from the decision dated February 28, 1958, by the Corps of Engineers Claims and Appeals Board. The appeal stated in part as follows:
Morrison-Knudsen Construction Company, Inc. hereby appeals from the decision of the Corps ox Engineers Claims and Appeals Board Decision No. 1061, and from the contracting officer’s findings of fact relating to the claims involved m such hearing.
(b) The plaintiff’s appeal was referred to the Armed Services Board of Contract Appeals, as the authorized representative of the Secretary of the Army for the consideration of such matters. The appeal was assigned the number ASBCA No. 4929.
(c) On August 15, 1960, the Armed Services Board of Contract Appeals rendered a decision on the plaintiff’s appeal in ASBCA No. 4929. The decision stated in part as follows:
* * * We find the evidence establishes that the contractor encountered permafrost with respect to Increment L-l, which constituted a “changed condition” within the meaning of the pertinent article in the prime contract. Nine borings within about 250 feet of the Increment L-l site, and another about 760 feet from the site, showed no frozen material. The nearest boring *756 showing permafrost was about 3,200 feet from the Increment L-l site. The contractor is entitled to an equitable adjustment with respect to the permafrost encountered in excavating for the construction of Increment L-l.
As to the sites for Increments L-3 and 4, and Increments L-5 and 6, we arrive at a different conclusion. Of the 15 borings taken in the general area of these four increments, 8 indicated that frozen material extending to the bottom of the borings was encountered at various depths. Borings 1318 and 1320 are shown as being immediately adjacent to each site, with an indication that frozen material had been encountered at a depth of 10 feet and extended to the bottom of the borings. The original field logs show that frozen material was actually encountered in drilling Bor-ings L-DH 260 and L-DH 261, but such information was not on the map. The contractor says that it gave more weight to Borings L-DH 260 and L-DH 261 because they were taken subsequent to Borings 1318 and 1320. However that may be, the boring logs, taken as a whole — even though information as to permafrost encountered was omitted with respect to Borings L-DH 260 and L-DH 261 — clearly indicate that the contractor should have expected to encounter permafrost in excavating for the sites for Increments L-3, L-4, L-5, and L-6. The Government does not deny the fact of mis-location of several of the borings. However, this claim, under the “Changed Conditions” article, is based on actual conditions encountered differing materially from those indicated on the drawings. From such drawings the Board finds that the contractor should have expected permafrost, as aforeindicated, and this conclusion is not disestablished because of the erroneous location of some of the borings.
The appeal is sustained insofar as it pertains to permafrost being encountered with respect to Increment L-l and is denied insofar as it pertains to Increments L-3, L-4, L-5, and L-6.
(d) The factual determination, in the nature of a conclusion, by the Armed Services Board of Contract Appeals that the contractor (i.e., the present plaintiff) should have expected to encounter some permafrost in excavating for the sites of Increments L-3 and L-4 and Increments L-5 and L-6 was not fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, and it was supported by substantial evidence, both in the record that was before *757 tbe ASBCA at the time and in the whole record that is before the court.
(e) Asa result of subsequent negotiations between the parties, the defendant allowed the plaintiff an equitable adjustment on account of the encountering of permafrost in excavating at the site for Increment L-l. This adjustment, which was satisfactory to the plaintiff, took the form of modifying the contract price upward to the extent of $18,208.50.[9]
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of one thousand six hundred nine dollars ($1,609).

 The evidence In the record does not establish the average thickness of the strata or pockets of permafrost In the area of the Ladd Air Force Base, or the average depth at which the permafrost Is encountered.

 The defendant had also encountered seasonal frost In each of the drill holes designated as 260 and 261, and the seasonal frost extended from the surface of the ground down to a depth of 5 feet in each hole. However, there is no complaint in the present action relative to the defendant’s misrepresentations concerning the purported absence of seasonal frost.

 Permafrost was also encountered in excavating at the site for Increment L-l. However, that is not directly involved in the present litigation, as the defendant made an equitable adjustment in the contract price that was satisfactory to the plaintiff with respect to the encountering of permafrost at L-l.

 As a result of subsequent negotiations between tbe parties, the defendant increased the contract price by $18,208.50 in allowing the plaintiff an equitable adjustment on account of the permafrost that was encountered and removed from the L-l excavation. This adjustment was evidently satisfactory to the plaintiff, as no complaint is made in the present litigation regarding the permafrost in the L-l excavation. It appears that approximately 4,333 cubic yards of permafrost was removed from this excavation, out of a total of approximately 6,333 cubic yards of excavated material at L-l.

 In connection with the matter of an equitable adjustment, it is of some interest to note that the total excavation performed under Item 1 of the contract amounted to 36,979 cubic yards, and that approximately 10,297 cubic yards of this material consisted of permafrost. Thus, the permafrost that was excavated under Item 1 of the contract comprised approximately 27.85 percent of the total material that was excavated under Item 1. This was probably a higher percentage of permafrost than is ordinarily encountered in a large-scale excavation project within the area of the Ladd Air Force Base, although the evidence on this point is not fully developed in the record. There is some indication in the record that perhaps the plaintiff should have expected to encounter permafrost to the extent of about 15 percent of the total material excavated under Item 1 of the contract. On that basis, the plaintiff should have expected to encounter approximately 5,547 cubic yards of permafrost in performing the excavation work under Item 1 of the contract, whereas the amount actually encountered was approximately 10,297 cubic yards. (However, the plaintiff has already received an equitable adjustment amounting to $18,208.50 because of encountering permafrost in the performance of Item 1, and! an additional recovery of $1,609 is allowable under this opinion.

 The other test borings were shown as having been made at points so distant from Increments L-3 and L-4 and from Increments L-5 and L-6 that they did not shed any significant light on the nature of the subsurface conditions at the two sites with which the court is concerned in the present litigation.

 The plaintiff also encountered permafrost in excavating at the site of Increment L-l.

 It had been the plaintiff's original idea, when it expected to do the excavation, that the slope ratio should he 1-to-l.

 It appears that approximately 4,333 cubic yards of permafrost was encountered and excavated at the site for Increment L-l. It further appears that all the permafrost excavated In performing Item 1 of the contract totaled approximately 10,297 cubic yards and comprised about 27.85 percent of the material (36,979 cubic yards) that was excavated under Item 1.