T. F. SCHOLES, INC., and Berks County Trust Company

v.

The UNITED STATES.

No. 34–63.

United States Court of Claims.

March 18, 1966.

O. P. Easterwood, Jr., Washington, D. C., for plaintiffs. McNutt, Dudley & Easterwood, Washington, D. C., of counsel.

Thomas J. Lydon, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. Sheldon P. Migdal, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 24, 1965. On December 20, 1965, plaintiffs filed an election to submit the case on the commissioner's report without exceptions and brief, and on January 3, 1966, defendant filed a statement under Rule 62 (b) and motion that the court adopt the commissioner's report, including conclusions of fact and law. Since the court agrees with the trial commissioner's findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. The court therefore concludes that plaintiffs are not entitled to recover and the petition is dismissed. It is further concluded that the defendant is entitled to recover of and from the plaintiff, T. F. Scholes, Inc., on the counterclaims, and judgment is entered for defendant and against the said plaintiff thereon in the sum of $168,059.-22, together with penalties and interest as provided by law on the $146,620.06 involved in the second counterclaim.

OPINION OF COMMISSIONER *

*Changed Conditions*

WHITE, *Commissioner:* One of the problems before the court in this case is to decide whether the plaintiff T. F. Scholes, Inc., was entitled to an equitable adjustment under the "changed conditions" provision of a contract numbered AF 05(613)–87.[1] This question has previously been considered by the Armed Services Board of Contract Appeals, which gave a negative answer to the question in a decision dated December 27, 1957 (ASBCA No. 4616).

Contract AF 05(613)–87 was entered into on March 23, 1956, between T. F. Scholes, Inc., and the defendant, represented by a contracting officer of the United States Air Force. It covered 52 items of work that related, in general, to the improvement of the site for the new United States Air Force Academy, located approximately 10 miles north of Colorado Springs, Colorado. The total contract price was $2,373,586.30. (For the sake of convenience, T. F. Scholes, Inc., will usually be referred to hereafter in the opinion as "Scholes," and contract AF 05(613)–87 will usually be referred to as "the contract.")

The contract contained the standard "changed conditions" provision that is customarily found in Government construction contracts, under which the contractor was authorized to submit to the contracting officer a claim for an equitable adjustment in the contract price if an increase in the cost of performance was

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. The record before the court does not disclose what interest, if any, the plaintiff Berks County Trust Company has in the subject matter of the lawsuit. The initial submission of the claims set out in the petition is on the issue of liability only, and it is inferred that the Berks County Trust Company's interest will arise only in the event of a recovery by T. F. Scholes, Inc.

caused by "(1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract." If the contractor was dissatisfied with the contracting officer's action on such a claim, the contractor was authorized to take an appeal under the "disputes" provision of the contract to the Armed Services Board of Contract Appeals, acting for the Secretary of the Air Force. The "disputes" provision declared that the decision of the Board should, "unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive."

In soliciting bids for the performance of the proposed contract, the Air Force had listed the numerous items of work that were to be performed, and had set out an estimated quantity of material in connection with each item. Of special significance in connection with this case were Items 6 and 7, as follows:

| Item No. | Description | Estimated quantity | Unit | Unit price | Amount |
|---|---|---|---|---|---|
| 6. | Excavation, Common ............ | 3,911,000 | C.Y. | ............ | ............ |
| 7. | Excavation, Rock ................ | 200 | C.Y. | ............ | ............ |

Prospective bidders were informed that rock excavation would cover the removal and disposition of all boulders measuring ½ cubic yard or more in volume, as well as rock in ledges and other rock deposits which could not be removed without drilling and blasting, and that common excavation would cover the removal and disposition of "all material not classified as rock, ditch, structural and exclusive of stripping of topsoil." Hence, boulders and other rocks measuring less than ½ cubic yard in volume were to be removed and disposed of as part of the common excavation.

Scholes' bid was 20 cents per cubic yard on the common excavation, and $8 per cubic yard on the rock excavation, and these unit prices were incorporated in the contract for Items 6 and 7, respectively.

Upon receiving the award of the contract, Scholes entered into a subcontract with Paul Hooper, Inc., whereby the latter was to perform the work called for under Items 6 and 7 of the contract.

Paul Hooper, Inc., commenced the excavating operations about the middle of April 1956. In approximately two weeks, the subcontractor began to encounter considerable quantities of rocks in the subsurface at depths that ranged from 5 to 25 feet in different parts of the excavation area. Thereafter, and throughout the remainder of the excavation work, rocks comprised a very substantial percentage of the material excavated at the work site. They were of all sizes, from small rocks up to one boulder that measured approximately 44 cubic yards in volume.

During the course of the performance of the excavation work, the subcontractor encountered, and was required to remove and dispose of, a total of approximately 60,000 cubic yards of so-called "classified rock." All of this classified rock consisted of large boulders measuring ½ cubic yard or more in volume. This total quantity of big boulders was, of course, vastly disproportionate to the Government's estimate of 200 cubic yards of classified rock under Item 7 of the contract. However, no claim was ever submitted to the contracting officer—and no claim is asserted in the present litigation

—on the ground that, instead of encountering and having to deal with the estimated quantity of 200 cubic yards of classified rock, Scholes (through the subcontractor) encountered and was compelled to deal with approximately 60,000 cubic yards of big boulders measuring ½ cubic yard or more in volume. Scholes and the excavation subcontractor were evidently satisfied with the unit price of $8 per cubic yard for the excavation of such boulders, irrespective of the quantity involved.

In addition to the big boulders mentioned in the preceding paragraph, the excavation subcontractor also encountered, and was required to remove and dispose of, a large quantity of boulders and other rocks measuring less than ½ cubic yard in volume. Such of these rocks as were 6 inches or less in diameter could be handled effectively by the subcontractor's equipment, and they could be used, and were used, without difficulty as part of the fill on the construction job. However, the rocks that were more than 6 inches in diameter caused the excavation subcontractor great difficulty.

The record does not show, and apparently there is no means of determining, the total quantity of rocks more than 6 inches in diameter, but less than ½ cubic yard in volume, that were encountered, removed, and disposed of during the course of the excavation work. Estimates varying from approximately 133,000 cubic yards to approximately 600,000 cubic yards have been made with respect to this quantity. It was necessary for these rocks to be handled at the common excavation unit price of 20 cents per cubic yard under Item 6 of the contract, rather than at the unit price of $8 per cubic yard for rock excavation under Item 7.

While the excavation work was in progress, Scholes and the excavation subcontractor orally expressed to the responsible Air Force personnel on many occasions dissatisfaction over the fact that the common excavation contained an unexpectedly large quantity of rocks which were too small to qualify as rock excavation and which were more difficult and expensive to handle than dirt. In this connection, there was no reasonable basis for Scholes or the excavation subcontractor to anticipate from a visual inspection of the surface of the excavation area prior to the beginning of the excavating operations that the subsurface would contain such large quantities of rocks.

Finally, on April 25, 1957, Scholes submitted to the contracting officer a formal claim for an equitable adjustment under the "changed conditions" provision of the contract, on the ground that "subsurface or latent physical conditions differing materially from those indicated in the contract, have caused an increase in the cost of the performance of the contract." Scholes requested that the unit price for common excavation (Item 6) be increased from 20 cents per cubic yard to 48.5 cents per cubic yard.

The contracting officer, in a letter dated August 23, 1957, denied Scholes' claim based upon the "changed conditions" provision of the contract. Scholes thereupon took an appeal to the Armed Services Board of Contract Appeals.

A 4-day hearing on Scholes' appeal was held in Washington, D. C., before a member of the Air Force panel of the Armed Services Board of Contract Appeals. The gist of the evidence presented by the claimant was that the Air Force, by estimating in the contract that 200 cubic yards of big rocks measuring ½ cubic yard or more in volume would be encountered in the course of the excavation work, had misled Scholes (and the excavation subcontractor) into assuming that the common excavation would involve a correspondingly insignificant quantity of rocks measuring less than ½ cubic yard in volume; that the plans for the performance of the excavation work, including the type of equipment purchased, were based upon this assumption that the common excavation would include few rocks and would consist almost wholly of dirt; and that when large quantities of rocks more than 6 inches in diameter, but less than ½ cubic yard in volume,

were encountered in the subsurface, this substantially increased the difficulty and cost of performing the common excavation beyond that anticipated when the contract was made.

■ On December 27, 1957, the Armed Services Board of Contract Appeals rendered its decision (ASBCA No. 4616) on Scholes' appeal. In its decision, the Board included an extensive statement of the happenings that led up to the filing of the claim, and the writer has found that these factual determinations by the Board were not fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, and that they were supported by substantial evidence in the record before the Board. Consequently, such factual determinations by the Armed Services Board of Contract Appeals are final and conclusive under Section 1 of the so-called Wunderlich Act (41 U.S.C. § 321 (1964)). T. C. Bateson Construction Co. v. United States, 149 Ct.Cl. 514, 518 (1960); Ivy H. Smith Co. v. United States, 154 Ct.Cl. 74, 83 (1961).

On its analysis of the facts, the Armed Services Board of Contract Appeals concluded that "there was no reasonable reliance on the erroneous estimate" and, accordingly, that Scholes was not entitled to an equitable adjustment under the "changed conditions" provision of the contract.

One of the problems in the present case is to delineate the scope of judicial review with respect to the administrative determination referred to in the preceding paragraph. In this connection, it should be noted at the outset that the Air Force did not make any estimate, or set out in the invitation for bids or the contract any other form of express representation, concerning the quantity of rocks more than 6 inches in diameter, but less than ½ cubic yard in volume, that would be involved in the common excavation. Hence, the question arises as to whether the Air Force, when it set out in the contract an estimate to the effect that 200 cubic yards of big rocks measuring ½ cubic yard or more in volume would

be encountered in the performance of the excavation job, thereby impliedly represented that a correspondingly small quantity of rocks more than 6 inches in diameter, but less than ½ cubic yard in volume, would be encountered.

■ When an administrative decision concerning the allowability of an equitable adjustment under the "changed conditions" provision of a contract turns on the proper interpretation of the contract, in order to determine whether the subsurface or latent physical conditions at the site of the work differed materially from those indicated in the contract, the administrative agency is deciding a question of law, and its decision on such a question is not necessarily final and conclusive, even though it may meet all the criteria specified in the first section of the Wunderlich Act. Kaiser Industries Corp. v. United States, 340 F.2d 322, 333–334, 169 Ct.Cl. 310, 330–331 (1965); Morrison-Knudsen Co. v. United States, 170 Ct.Cl. 757, 764, 345 F.2d 833, 837 (1965).

However, the record which was before the Armed Services Board of Contract Appeals, and which is now before this court, contains the testimony of a professional geologist indicating that in a given excavation area there is not necessarily, or even ordinarily, any corresponding relationship between the quantity of rocks measuring ½ cubic yard or more in volume and the quantity of rocks more than 6 inches in diameter but less than ½ cubic yard in volume. The record does not contain any conflicting testimony of a persuasive nature. Consequently, although it actually happened in the present case that a large quantity of big rocks measuring ½ cubic yard or more in volume was accompanied by a large quantity of rocks more than 6 inches in diameter but less than ½ cubic yard in volume, it must be concluded that this was coincidental rather than something to be expected normally in the performance of excavation work. On that basis, the Air Force's erroneous estimate that 200 cubic yards of classified rock would be encountered in the course of the exca-

vation work did not constitute an implied representation that the quantity of rocks more than 6 inches in diameter, but less than ½ cubic yard in volume, involved in the common excavation would be correspondingly small.

Hence, I agree with the Armed Services Board of Contract Appeals that the erroneous estimate by the Air Force concerning the quantity of classified rock that would be encountered during the course of the excavation work was not something that Scholes could reasonably rely on as an implied representation that a correspondingly small quantity of rocks more than 6 inches in diameter, but less than ½ cubic yard in volume, would be encountered in the subsurface.

In connection with the claim based upon the alleged "changed conditions," it perhaps should be mentioned that the record does not contain any evidence tending to prove that the extent of the subsurface rocks at the site of the excavation work constituted a condition "of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering" in excavation work in the general geographical area where this contract was performed. On the contrary, persons who were familiar with the area, which lies immediately adjacent to the Rampart Range of the Rocky Mountains, anticipated that large quantities of rocks would be encountered in the subsurface, although such persons did not differentiate in their estimates as between rocks measuring ½ cubic yard or more in volume and rocks measuring less than ½ cubic yard in volume. Scholes and the excavation subcontractor were not previously familiar with the area or experienced in the performance of excavation work there.

There is another aspect of this claim that requires discussion. Prior to the issuance of the invitation for bids on the proposed contract, the Air Force had retained an architect-engineering firm to prepare the plans and specifications, and this firm had caused 122 borings to be made in the area of the prospective excavation for the purpose of ascertaining subsurface conditions. These borings were more or less evenly spaced throughout the area. The information obtained in these operations was recorded in graphic boring logs, which became part of the invitation for bids and, ultimately, of the contract. These graphic representations indicated that boulders (of unspecified size) had been encountered in 41 of the holes, and that no boulders had been encountered in 81 of the holes, down to the depth of the ultimate excavation. The borings logs were correct, except that the drilling of 7 of the 81 holes mentioned in the preceding sentence had actually been stopped because boulders were encountered. Thus, the invitation for bids and the contract gave erroneous information as to 7 borings by indicating that no boulders had been encountered in such borings, when in fact boulders had been encountered in them.

A contractor, in submitting a bid and in entering into a contract with a Government agency, has a right to rely on positive representations made by the agency regarding subsurface conditions at the site of the work. Levering & Garrigues Co. v. United States, 73 Ct. Cl. 566, 574 (1932). Such representations amount to a warranty and establish a predicate for a possible action for breach of contract if it is later discovered that the representations are untrue. Morrison-Knudsen Co. v. United States, 345 F.2d 535, 539, 170 Ct.Cl. 712, 718 (1965). However, an essential prerequisite for a recovery on such a cause of action is proof that the contractor was misled by the agency's misrepresentations. Ragonese v. United States, 120 F.Supp. 768, 770–771, 128 Ct.Cl. 156, 162 (1954).

In the present case, the record fails to show that Scholes was misled by the Air Force's misrepresentations concerning the results of the seven borings previously mentioned. On the contrary, the evidence in the record indicates that Scholes' belief that the common excavation would consist almost wholly of dirt was not based upon a study of the boring logs but, rather, upon the Air Force's

estimate of classified rock, previously discussed.

Also, it should be mentioned that the Air Force's architect-engineering firm, on the basis of the borings data previously mentioned, calculated that approximately 150,000 cubic yards of rocks would be encountered in connection with the performance of the excavation work. No differentiation was made in this calculation as between rocks measuring ½ cubic yard or more in volume and rocks measuring less than ½ cubic yard in volume. This estimate of 150,000 cubic yards of rocks was not disclosed to Scholes (or to the other bidders) in connection with the invitation for bids or the making of the contract.

■ With respect to the failure of the Air Force to disclose to Scholes and other bidders the estimate mentioned in the preceding paragraph, it is readily apparent that this was not a situation where a Government agency withheld or concealed vital information which it alone had, and which it knew that bidders did not have and would need in order to make an intelligent appraisal of the problems and costs that would be involved in the performance of a proposed contract. If those particular factors had been involved here, the failure to disclose the vital information would have provided a predicate for the assertion of a claim based upon the breach of an implied contractual obligation. Cf. Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 777–778, 160 Ct.Cl. 437, 443–444 (1963). What the Air Force failed to disclose to bidders in this case was merely a calculation which its architect-engineering firm had made upon the basis of borings data. The borings data themselves were made available to bidders, and the latter were free to make their own calculations upon the basis of such data as to the presence of rocks in the subsurface of the excavation area. As previously mentioned, the information which the Air Force furnished to bidders along this line contained certain errors which would have affected bidders' calculations to some extent. However, Scholes did not make a calculation as to subsurface conditions on the basis of the borings data and, hence, was not misled by the errors.

For the reasons previously indicated, it is my opinion that Scholes is not entitled to recover on the claim discussed in this part of the opinion.

### Breaches of Contract

The petition alleges that the defendant breached the contract in certain respects, to Scholes' injury, by issuing work orders that required additional work but without making proper adjustments in the contract price, by delaying unduly the designation of a disposal area for the rocks previously mentioned that were more than 6 inches in diameter, and by issuing orders concerning the sequence of work that caused work disruptions and other inefficiencies.

Scholes has not offered any new evidence, or called attention to any evidence in the administrative record, supporting the allegations in the petition that Scholes was adversely affected by such alleged breaches of contract.[2]

■■ As anyone seeking to recover in this court has the burden of proving the asserted right to recover, it is necessary in the present case to find against Scholes with respect to the breach-of-contract allegations in the petition.

### Measurement

The defendant has asserted a first counterclaim against Scholes in the amount of $21,439.16.[3] This counterclaim is based upon an "equitable adjust-

2. The administrative record does contain a decision by the Armed Services Board of Contract Appeals dated February 29, 1960 (ASBCA No. 5010) that was favorable to a subcontractor on certain claims similar to some of those mentioned in this part of the opinion. However that decision does not show any entitlement on the part of Scholes, the prime contractor, to recover.

3. No reply to this counterclaim was filed in accordance with Rules 6(a) and 16(a) of the Rules then in effect (now Rules 10(a) and 20(a).

ment" downward in the total price for common excavation (Item 6) that was made by the contracting officer on May 28, 1962, upon the basis of a decision (ASBCA No. 5606) previously rendered by the Armed Services Board of Contract Appeals on August 22, 1961.

The Board's decision involved an interpretation of subparagraph (1) of paragraph "a" of technical provision 4–21 of the contract, which covered the subject of the measurement of common excavation (Item 6) for pay purposes. That subparagraph provided in part as follows:

(1) *Measurement*: The quantity to be paid for will be the number of cubic yards of material in its original position, and tenths thereof, excavated, placed in fill or stockpiles, completed and accepted and/or wasted. Measurement will be determined by original cross-sections established from aerial topographic maps included in the contract drawings and final sections taken after excavating operations and computed by the average end area method. * * *

The problem which was dealt with in ASBCA No. 5606 and which is involved in the defendant's first counterclaim arose because time was important in preparing the plans for the proposed contract, and in order to save time the Air Force made use of aerial photographs in preparing contour maps of the surface of the work site. These contour maps purported to show the original ground surface at contour intervals of 2 feet. Scholes' bid on the common excavation was based on the assumption that the contour maps reflected with reasonable accuracy the actual surface of the ground.

Scholes was initially paid for common excavation under Item 6 of the contract on the basis of measurements determined by the original cross-sections established from the aerial topographic maps previously mentioned and subsequent final cross-sections prepared on the basis of a conventional survey made after the excavation operations were completed. This resulted in the making of payment to Scholes for a total of 4,289,923.6 cubic yards of common excavation at the unit price of 20 cents per cubic yard prescribed under Item 6 of the contract.

After Scholes had been paid for the common excavation, as indicated in the preceding paragraph, it was noted that the original ground elevations, as shown on the contour maps prepared from aerial photographs, did not coincide with the actual undisturbed ground elevations along the points where the excavation ended. This was apparently due in large part to the unusually high percentage of errors that developed in preparing the original contour maps from aerial photographs made of mountainous terrain. In this connection, the elevation of the original ground at the work site fell from approximately 7,300 feet in the southwest to approximately 6,975 feet in the northeast. Because of such errors, the proposed excavation work, as shown on the original cross-sections, extended horizontally beyond the outer limits of the actual excavation work that was performed in relation to the real surface of the ground.

On the basis of the discrepancies mentioned in the preceding paragraph (and other matters that are not involved in the present litigation), the contracting officer, by means of a letter dated February 23, 1959, proposed an equitable adjustment downward in the total contract price. Scholes took an appeal from this action to the Armed Services Board of Contract Appeals.

After a 6-day hearing was held in Colorado Springs, Colorado, and in Washington, D. C., the Board rendered a decision dated August 22, 1961 (ASBCA No. 5606) on Scholes' appeal. One of the points involved in the decision was whether Scholes was entitled to be paid, under Item 6 of the contract, for the space which extended outward laterally from the area actually excavated to the outer limits of the proposed excavation area shown on the original cross-sections, and which Scholes did not in fact excavate. The Board decided this question in the negative.

After the Board's decision was rendered, the contracting officer computed that Scholes had been overpaid $21,439.16 for 107,195.8 cubic yards of space that had not actually been excavated. Demand was made on Scholes for this sum as an "equitable adjustment" downward of the contract price for Item 6. Scholes did not pay such amount, and the defendant is demanding it as the first counterclaim in the present action.

Scholes does not question the accuracy of the contracting officer's computation, as mentioned in the preceding paragraph. Scholes does question, however, the correctness of the decision by the Armed Services Board of Contract Appeals in ASBCA No. 5606 with respect to this issue.

■■■ The administrative decision discussed in this part of the opinion was based upon a construction of the contract. Consequently, the Armed Services Board of Contract Appeals was deciding a question of law, and its decision on this question is not necessarily final and conclusive under the Wunderlich Act, even though it may meet all the criteria specified in the first section of that statute. Kaiser Industries Corp. v. United States, supra, 340 F.2d at pages 333–334, 169 Ct.Cl. at pages 330–331; Morrison-Knudsen Co. v. United States, supra, 345 F.2d at page 838, 170 Ct.Cl. at page 764.

■■■ It is my opinion, however, that the Armed Services Board of Contract Appeals was correct. The first sentence of the provision of the contract governing the measurement of common excavation for payment purposes states plainly that "The quantity to be paid for will be the number of cubic yards of material * * * *excavated*, placed in fill or stockpiles, completed and accepted and/or wasted." (Emphasis supplied.) This sentence is not ambiguous, and it indi-

cates that material must be "excavated" in order to qualify for payment. The 107,195.8 cubic yards of space involved in this portion of the opinion was not excavated and, therefore, Scholes was not entitled to receive payment for it.

It is true that the measurement provision involved here contained a second sentence to the effect that "Measurement will be determined by original cross-sections established from aerial topographic maps included in the contract drawings and final sections taken after excavating operations and computed by the average end area method." This sentence was subsidiary to the first sentence, discussed in the preceding paragraph, and indicated how the material that was excavated should be measured for the purpose of calculating the amount due Scholes. It does not negative the previous conclusion that it was necessary for material to be excavated in order to qualify for payment.

On the basis of the discussion in this part of the opinion, the defendant is entitled to recover $21,439.16 from Scholes on the first counterclaim.

### *Taxes*

The defendant, acting through the Secretary of the Treasury, assessed against Scholes on May 3, 1963, the sum of $146,741.58 as taxes and interest due for Scholes' fiscal year that ended on March 31, 1954. The defendant gave to Scholes on May 3, 1963, notice and demand for payment with respect to this assessment.

A credit of $121.52 was allowed Scholes with respect to the tax assessment mentioned in the preceding paragraph, leaving the sum of $146,620.06 due from Scholes to the defendant.

No part of the $146,620.06 has been paid by Scholes, and the defendant has asserted a second counterclaim in the present action for the recovery of this amount.[4]

---

4. No reply to this counterclaim was filed. The second counterclaim originally covered other tax assessments in addition to the assessment mentioned in this por-

tion of the opinion. However, the defendant later withdrew its demand with respect to the other assessments.

It appears that the defendant is entitled to recover on the second counterclaim the sum of $146,620.06, plus penalties and interest as provided by law.

*Conclusion*

For the reasons set out in the preceding portions of this opinion, Scholes is not entitled to recover on the claims set out in the petition, the defendant is entitled to recover the sum of $21,439.16 on its first counterclaim, and the defendant is entitled to recover the sum of $146,620.06, plus penalties and interest as provided by law, on its second counterclaim. Accordingly, the petition should be dismissed, and judgment should be entered for the defendant on its counterclaims in the total sum of $168,059.22, together with penalties and interest as provided by law on the $146,620.06 involved in the second counterclaim.