Pee Ctjeiam :
This case was referred to Trial Commissioner George Willi, with directions to make recommendation for conclusions of law on plaintiff’s motion and defendant’s cross-motion for summary judgment. The commissioner did so in an opinion and report filed on February *638 16, 1966. Plaintiff filed a request for review of the commissioner’s opinion and the case was submitted to the court on the briefs of the parties and on oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff’s motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted, and plaintiff’s petition is dismissed.
Commissioner Willi’s opinion, as modified by the court, is as follows:
In 1954 the Army Corps of Engineers awarded a contract for the construction of the Table Nock Dam, a very large flood control and hydroelectric project situated on the White River in southwestern Missouri.
From the beginning it was evident that the size of the proposed dam was such that its impoundment of upstream waters would be so extensive as to necessitate the relocation of a number of highway bridges across the White River and certain of its tributaries.
The entire Table Rock project, including both the Dam and the relocation of various upstream bridges, was under the auspices of the Corps of Engineers pursuant to a master plan under which performance of the latter work was to be chronologically integrated with the construction of the Dam.
One of the affected bridges was located east of Blue Eye, Missouri, on Long Creek, a stream that entered White River a short distance above the Table Rock Dam. The replacement bridge was to be located about five miles from the Dam and was within the reservoir to be created by the Dam. This suit, presented for decision on the parties’ cross-motions for summary judgment, arises out of plaintiff’s performance of a Corps of Engineers contract let in 1956 for the construction of the substructure of that bridge.
Under its contract, advertised to bidders on September 24, 1956, and awarded October 31, 1956 (with a completion date of July 15, 1957), plaintiff was to build six reinforced concrete supporting piers across Long Creek plus a bridge abutment at each end. Only two of the piers, Nos. 3 and 4, were *639 to be built in the stream bed proper. The remainder were to be put in ascending locations on the banks of the stream with the abutments to be placed at the highest elevations on each side.
Paragraph 7c of the Special Conditions of plaintiff’s contract [1] provided as follows:
Stream data. Hydrographs and rating curves for the White River are available for inspection at the office of the District Engineer, Little Rock District, 300 Broadway, Little Rock, Arkansas. There are no stream flow records on Long Creek. The stream is subject to sharp-crested rises which occur most frequently in the spring. Final closure at Table Rock Dam was made on 9 September 1956 and all river flow is being diverted through the four 4- by 9-foot conduits in the dam which have invert elevations at 722. The conduit capacity is sufficient to pass the flow of White River except during flood periods when water will be temporarily impounded in the reservoir.
The progress schedule for the Dam, approved December 17, 1954, contemplated the commencement of concreting operations on May 1, 1955, and the completion of such operations on May 31, 1958, thirty-seven months later. It was on this projected timetable for work at the Dam that the Corps based the award and completion dates that it utilized in the several contracts, including plaintiff’s, that it later let for the upstream relocation work.
In fact, by October 31, 1956, when the plaintiff’s contract was awarded, work on the Dam was some seven months ahead of the schedule previously described. With the Dam at that stage of completion, the flow of the White River past it was limited to the volume of water that could pass through the four 4x9 foot conduits that had been provided for that purpose near the base of the Dam structure.[2] The discharge capacity of these conduits was almost precisely equivalent to the average annual flow rate of the White River over the period 1922 through 1954. Upstream water volumes in *640 excess of tbe total discharge capacity of the four conduits were necessarily impounded until such time as the level of those waters exceeded the elevation of the low point in the upper profile of the main structure. Thereafter the excess waters simply spilled over the top of the uncompleted Dam.
Aside from the four conduits mentioned above, the only apertures built into the lower elevations of the Dam were several so-called penstocks or sluiceways whose eventual function it was to conduct regulated quantities of water into the Dam’s turbine chambers for the generation of hydroelectric power. During the period between installation of these openings and final completion of the Dam, they were sealed off by temporarily immovable (so rendered by use of wedges in combination with water pressure) bulkheads that were fashioned from the gates with which the penstocks were to be ultimately equipped for normal operation. The bulkheads were held solidly in place by the downstream pressure of the impounded waters.
The interaction of an unusual but precedented volume of precipitation in the spring of 1957 with the substantially accelerated progress towards completion of the Table Nock Dam created an impoundment of upstream waters so extensive that on April 4, 1957, the plaintiff had to suspend further work on piers 3 and 4 of its contract until September 23, 1957, when the water level receded to a point that permitted resumption. Because of this delay on the piers mentioned, the plaintiff did not complete its contract until December 16, 1957, rather than July 15, 1957, as originally specified.
Despite the problems encountered as to piers 3 and 4, the flooding that the plaintiff experienced did not materially interfere with the prosecution of any of its other work under the contract, because such work was to be performed at elevations above the flood level. Thus, when inundation necessitated the suspension of further work on the uncompleted piers 3 and 4, the plaintiff continued the remaining items of its contract work without interruption and completed them on or about June 17, 1957. It was from then until late September that the plaintiff was totally idled by the flooding.
The plaintiff seasonably requested, and was duly allowed, time extensions covering the entire period between the sched *641 uled and actual completion dates of its contract — a period of approximately five and one-half months.
The present litigation stems from the contracting officer’s refusal to authorize any additional compensation on account of the above delay and the subsequent affirmance of that action by the Corps of Engineers Board of Contract Appeals.
No testimony was offered by either party before the Board. The record consisted of the contract papers and a series of documentary exhibits plus a stipulation containing an agreed statement of the single factual issue presented for decision,[3] and statements of the four contentions on which the contractor rested its claim for relief.[4]
Following consummation of the stipulation, the plaintiff, represented by the same counsel that it has in this court, waived the regular hearing accorded it by the Buies of the *642 Board [5] and elected instead to present its position in the conference-type hearing, before a single Board member, that the same Buies authorized.[6]
The informal hearing was held on January 7, 1959, before a Board member[7] who shortly thereafter left the Corps of Engineers and did not participate in the preparation of the Board’s decision of August 20, 1959.
It is undisputed that at the hearing each of the parties adduced certain additional documents in support of their respective positions.[8] For the reasons given in footnote 8, *643 supra, it is also assumed that the two documents referred to in the affidavit accompanying plaintiff’s current motion for summary judgment were lodged with the Board, before or after the hearing but in any event prior to the decision.
Following the conference-hearing the parties filed simultaneous briefs with the Board. Those briefs are included in the certified Board record, and they furnish useful information as to both the evidence before the Board and the arguments urged upon it by the parties.
In a two-page decision[9] rendered August 20, 1959, the Board denied plaintiff’s appeal in all respects.
*644 First, the Board rejected tire plaintiff’s principal contention to the effect that the working conditions implied by the contract documents differed so materially from those actually encountered during performance that the latter constituted a changed condition within the meaning of the contract. Specifically, the Board found that the reference to temporary impoundment of flood waters contained in paragraph 7c of the Special Conditions of plaintiff’s contract,[10] when considered in the light of the hydrographic data[11] to which all bidders were referred by express language included in the same paragraph, did not amount to either a misrepresentation of water conditions to be reasonably anticipated at plaintiff’s work site or to a warranty that the plaintiff would be able to perform its contract work essentially in the dry. In support of this conclusion, the Board noted that the hy-drographic information referred to in the contract disclosed that in many prior years the flowage of the White River periodically exceeded the discharge capacity of the four conduits provided while the Table Rock Dam was under construction and that in two of such years, 1927 and 1945, the flowage rate and volume were substantially equivalent to that experienced in the spring of 1957 so that, had the Dam been in place during those two earlier years, the extent and duration of flooding at plaintiff’s work site would have been approximately the same as actually occurred during performance of the contract in suit. This collateral information, the Board held, required the word “temporarily” as used in paragraph 7c of the Special Conditions to be accorded a relative rather than an absolute meaning.
*645 Second, the Board found as a matter of fact that after the flood peril had materialized in April, 1957, there was no feasible or practicable means by which the Government could have increased the rate of flowage past the Dam, by opening the penstocks or otherwise, so as to relieve the situation.
Finally, and most importantly, the Board found that a prudent contractor, alerted by the hydrographic data to the strong likelihood of at least some flooding of the proposed work area, would reasonably have scheduled performance of the work entailed under plaintiff’s contract in a sequence that would have avoided interruption from flooding notwithstanding the extent of upstream impoundment that actually occurred. Under such a sequence, the work on piers 3 and 4, being at by far the two lowest elevations involved in the entire contract and also being the only two items of work ever prejudiced by high water, would have been made the first order of business and, had that been done, would have been completed by the time that flooding became a serious problem.
While the record before the Board apparently did not include the customary contractor’s progress schedule,[12] it did contain a plan and elevation blueprint of all of the component piers and abutments involved in plaintiff’s contract together with chronological notations marking the dates of commencement and completion for each. These notations, the correctness of which was and is undisputed by the parties, showed that plaintiff accorded no priority to work on piers 3 and 4 and, in fact, almost performed its total con *646 tract work in a sequence of descending elevations towards tbe bottom of Long Creek where piers 3 and 4 were located.[13]
The Board record also included a letter introduced by the plaintiff from an unsuccessful bidder on plaintiff’s contract. In that letter the Buie Construction Co. related that it did not include any increment in its bid to cover the contingency of delay from flooding. It added, however, that under normal working conditions it expected to have piers 3 and 4 completed before April 1957, when the flooding occurred.
Consistent with its failure to offer any exculpatory explanation of its failure to consult the hydrographic data referred to in its contract, the plaintiff offered no evidence, or even argument, in the administrative proceeding justifying the work sequence that it employed.
In its petition filed here, the plaintiff advanced several alternative theories, some legal and some factual, in support of its attack on the Board’s ultimate determinations. Thus, in sequence, the plaintiff asserted that paragraph 7c of the Special Conditions of its contract amounted to a representa *647 tion or warranty that its work site would not be flooded for any extended period; that the Government’s action in permitting the contractor at the Table Eock Dam to proceed with its construction ahead of schedule, thereby accelerating the rate of water impoundment, constituted an actionable hindrance to or interference with the plaintiff’s work; that the protracted flooding of plaintiff’s work area for piers 3 and 4 amounted to a changed condition within the meaning of its contract; that the Government’s failure to alleviate upstream flooding problems by providing additional discharge capacity at Table Eock Dam constituted a suspension of work for the Government’s convenience; and that the Board’s factual determinations to the effect (1) that the Government could not increase the discharge capacity of Table Eock Dam and (2) that the plaintiff could have avoided flooding problems by a judicious scheduling of its work, were “arbitrary, capricious, so grossly erroneous as necessarily to imply bad faith, and not supported by substantial evidence.”[14]
The defendant filed its answer, variously admitting and denying the several averments of the petition and pleading as an affirmative defense the finality of the Board decision by virtue of the standard disputes clause in plaintiff’s contract and the provisions of the Wunderlich Act, 41 U.S.O. §321.
After the pleadings were in, the defendant voluntarily produced a certified copy of what purported to be the complete record before the Board. Counsel agreed, however, that the subject matter of the certification was deficient as to at least some documents, and it is assumed for purposes of this opinion that it was equally deficient with respect to two other documents, a Table Eock Dam construction progress chart and a letter of December 9, 1958, to the plaintiff from the Morrison -Knudsen Co., a prime contractor on the Dam. See fn. 8, supra.
In the course of pretrial activities before the commissioner, the parties agreed that the court’s factual inquiry in this case would be limited to the content of the administrative *648 record. In furtherance of that understanding, the plaintiff filed its pending motion for summary judgment, to which defendant has responded by a cross-motion.
In contrast to the wide assortment of claims advanced by the plaintiff in its petition, as earlier noted, it makes only two basic contentions in its summary judgment motion.
First, plaintiff asserts that paragraph 7c of the Special Conditions of its contract constituted a warranty or representation that it would be able to perform its contract work without interruption by flooding or, at the least, that such flooding as did occur would be of a limited duration falling far short of the 514-month period that actually eventuated.
Second, the plaintiff contends that in the light of the record before it, the Board erred in failing to hold, as a matter of fact, that the Government inexcusably failed to alleviate the plaintiff’s flooding problem 'by refusing to adopt the relatively inexpensive procedure of having the Table Nock Dam contractor refrain from pouring one or more monolith blocks in the Dam between the period of April 30, 1957 and the time when the level of impounded water receded below the state of construction at April 30, 1957.
Significantly, in its summary judgment motion, the plaintiff makes no attack on, or indeed any mention of, the Board’s factual conclusion that a prudent contractor in the plaintiff’s position, alerted by the disclosures of the hydrographic data, would have arranged his work sequence in a manner that would have avoided flooding problems despite the water impoundment actually created by the Table Nock Dam.
In considering the issues that bear on this court’s ultimate decision as to liability,[15] it must be noted that in its petition[16] the plaintiff specifically challenged the sufficiency, under Wunderlich standards, of this Board determination — a determination within the Board’s legal competence and *649 authority and, therefore, binding here,[17] unless upset by a showing of inadequate evidentiary support or comparable infirmity. Having squarely focused on this question for pleading purposes, the plaintiff’s complete failure to pursue the matter in its motion for summary judgment assailing the Board’s denial of relief can only be taken as an acquiescence in that aspect of the Board’s decision.
The only other Wunderlich challenge to the Board’s decision asserted in plaintiff’s petition,[18] and the only one urged in its motion for summary judgment, is directed to its finding that there was no practicable means by which the Government could have increased the discharge capacity of the Dam so as to mitigate the problem of impoundment after it had become severe in the spring of 1957.
It is apparent from its decision that the Board dealt with this contention solely in terms of the feasibility of opening the penstock gates to relieve the excessive impoundment after *650 it bad actually materialized in the spring of 1957.[19] The Board concluded, with respect to this matter, that: “We find as a matter of fact tbat the Government could not increase the discharge capacity at the dam by opening the penstock gates, and that blasting open the dam itself was an alternative so inconceivable as to have no practical significance.”
The plaintiff takes no exception to the validity of the above finding. Instead, it asserts that the Board improperly failed to deal at all with the other means by which it had urged that discharge capacity could have been increased, i.e., the device of temporarily suspending further pouring of concrete at selected low points at the top of the uncompleted Dam. Though the stipulation filed with the Board is silent as to this matter, it does appear that the Morrison-Knudsen letter of December 9, 1958, and plaintiff’s arguments based on it we,re before the Board at the time that it rendered its decision.[20]
If liability in this case turned on the question of adjustment of discharge capacity at the Dam, the circumstances surrounding the rejected Morrison-Knudsen proposal are such as to require a return to the Board for its consideration and determinations with respect thereto. The ultimate liability implications of any determination that the Board could make on this point, however favorable to the plaintiff, are completely transcended by its ultimate determination respecting the plaintiff’s negligence as to work sequence. *651 That determination presupposes no adjustment of discharge capacity at the Dam. Rather, it declares that notwithstanding the impoundment and consequent upstream flooding that actually occurred, the plaintiff would have suffered no interruption of its work had it scheduled that work as a prudent contractor, alerted by the purport of the hydrographic materials, would have. Thus, despite any purported fault of the defendant, it was, in the final analysis, plaintiff’s negligence which caused plaintiff’s loss. In the circumstances of this case, this would preclude plaintiff from recovering. Cf. O'Donnell v. United States, 166 Ct. Cl. 107 (1964).
If the Board’s work-sequence determination be permitted to stand, as it must be for the reasons previously given herein, the plaintiff’s cause is not advanced simply by a showing that it could have operated negligently but not been delayed in its work if the Government had taken steps to arrest the progress of the Dam in order to alleviate the upstream flooding that was fundamentally attributable to excessive precipitation.
Plaintiff argues, however, that it was misled by the terms of SC-7c. But as just shown, even if there had been a misrepresentation of the kind which plaintiff alleges, this was not the cause of plaintiff’s damage and therefore plaintiff could still not prevail. Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712, 345 F. 2d 535 (1965); Ragonese v. United States, 128 Ct. Cl. 156, 120 F. Supp. 768 (1954). However, in any event there was no misrepresentation of the sort of which plaintiff complains.
Although the Board found the plaintiff’s contention on this question of law[21] to be without merit, its determination carries no finality. 41 U.S.C. § 322.
In urging that paragraph 7c of the Special Conditions of its contract[22] constituted a misrepresentation, the plaintiff’s presentation is essentially the same as it made before the Board.
*652 First, attention is directed to the contracting officer’s intra-office memorandum of October 5, 1956, in which, he notes the accelerated progress of work on Table Eock Dam and the substantial likelihood, based on historical hydrographic data, that at its advanced stage of completion the Dam would impound excessive amounts of runoff from the upcoming winter and spring precipitation for varying periods of time, depending on intensity. The memorandum specifically relates the likely effect of the apprehended difficulty to performance of each of the upstream relocation contracts, including the one later awarded plaintiff. As to that contract, then at the invitation stage, the memorandum states: “Conditions of impoundment may delay contract completion and could possibly generate a claim from the contractor for additional costs.” Finally, the memorandum reviews the respective cost and feasibility of various measures that might be taken to increase the discharge capacity of the Dam. The memorandum concludes with the following recommendation: “It is considered that the inconvenience and costs to be suffered by the traveling public and the possibility of claims originating from contractors due to potential flooding of the existing bridges and work areas would not be sufficient to warrant the expenditure which would be incurred in providing the additional discharge capacity at the dam. Accordingly, it is proposed that no further action in this direction be taken by this office.”
In light of the above, it must be assumed that during the time that plaintiff’s contract was under advertisement to bidders and when it was later awarded to the plaintiff, the Government was not only aware of the possibility that the work under it might be interrupted by flooding but indeed apprehended that precisely such a condition would occur.
The liability implications of this consideration, however potent when viewed in isolation, are completely undercut when account is taken of two additional and necessarily related features of the situation.
First, there is no indication in the record, and not even any suggestion by the plaintiff, that the Government’s awareness and concern were based on anything other than *653 the date of closure of the Table Rock Dam, of which all bidders were advised, coupled with the purport of the identical hydrographic data to which all bidders were expressly referred. The countervailing significance of these matters assumes added weight from the fact that specific reference to them is contained in the same contract provision containing the language that plaintiff assigns as the representation or warranty respecting working conditions. At the Board level the plaintiff stipulated that it did not consult the contract-referenced hydrographic data prior to submission of its bid. The plaintiff has neither asked to be relieved of this stipulation nor, assuming its factual accuracy, offered any exculpatory explanation with respect to it. Had plaintiff consulted this data, as did defendant, then plaintiff would have known that the threat of flooding existed. This was not a situation where defendant had superior knowledge of a material fact which it withheld from plaintiff.
In this regard, T. F. Scholes, Inc. v. United States, 174 Ct. Cl. 1215, 357 F. 2d 963 (1966) is squarely in point. In that case the Air Force’s engineering firm, using data equally available to plaintiff-excavator, estimated that 150,000 cubic yards of rock would have to be removed by plaintiff. Plaintiff had estimated that the excavation would be almost entirely dirt, but its estimate was not based on this data. The Air Force estimate was not disclosed to bidders. The court said: *654 The court held, therefore, that the rationale of Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 312 F. 2d 774 (1963), was inapplicable.
*653 With respect to the failure of the Air Force to disclose to Scholes and other bidders the estimate * * *, it is readily apparent that this was not a situation where a Government agency withheld or concealed vital information which it alone had, and which it knew that bidders did not have and would need in order to make an intelligent appraisal of the problems and costs that would be involved in the performance of a proposed contract. * * * What the Air Force failed to disclose to bidders in this case was merely a calculation which its architect-engineering firm had made upon the basis of borings data. The borings data themselves were made available to bidders, and the latter were free to make their own calculations upon the basis of such data * * * [Id. at 1226, 357 F. 2d at 970.]
*654 Finally, it cannot be said that, considered in the context of the known date of Dam closure and the teachings of the hydrographic data, the contract reference to temporary impoundment was either a misrepresentation of future conditions to be reasonably anticipated or a warranty that the plaintiff’s work site would remain essentially dry. Taking-account of the entire content of paragraph 7c of the Special Conditions, together with the disclosures made thereby, the temporariness referred to must be understood to mean no more than nonpermanent.
In the circumstances of this case, the plaintiff’s admitted and unexplained failure to consult the relevant extrinsic data to which it was specifically referred by its contract is fatal to a claim of liability based on an asserted Government breach of contract representations. A contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid. Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 312 F. 2d 408, 414 (1963) ; Leal v. United States, 149 Ct. Cl. 451, 460, 276 F. 2d 378, 383 (1960).
It is accordingly recommended that plaintiff’s motion for summary judgment be denied, defendant’s motion for summary judgment granted, and plaintiff’s petition dismissed.

 The contract also included, as paragraph 3 of the General Conditions, the standard clause respecting site investigation and contractor responsibility in respect thereto. See e.g., Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 313 F. 2d 408, fn. 11.

 These tvere the conduits specifically described in paragraph 7c of the Special Conditions of plaintiff’s contract previously quoted.

 Paragraph 15 of the stipulation provided:
“The only factual Issue involved in this claim on which a dispute exists Is the matter of whether or not the penstock gates could have been opened in order to expedite the release of floodwaters from the reservoir.”

 Paragraph 2 of the stipulation provided :
“By letters dated 17 April, 7 June, and 18 October, 1957, the contractor requested additional compensation in an unstated amount and an extension of the contract performance time based on the following:
“(a) An alleged ‘Changed Condition’ in that the following-quoted portion of paragraph SC-7c: ‘the conduit capacity is suffleient to pass the flow of White River except during flood period when water will be temporarily impounded in the reservoir,’ is a misrepresentation, such allegation being based on the contention that as of 4 April 1957 and thereafter the capacity of the conduits proved to be inadequate and the contractor’s work area was inundated to a degree not anticipated and beyond the contemplation of either the Government or the contractor.
“(b) That paragraph SC-7c is a representation and warranty that the contractor could expect to work in the dry under normal water conditions on Long Creek not augmented by floodwater backed up from Table Rock Dam, and that such representation, coupled with the flood situation, brings the matter within the ‘Changed Conditions’ clause of the contract.
“(c) That the last two sentences of paragraph SC-7c are a representation and warranty that work specified in the contract could be performed in the dry, that such representation was placed in the specifications for the purpose of inducing bidders to eliminate any bid contingencies and give the Government the benefit of a low price for working in the dry, and since such contingency was not realized, the contractor is entitled to an equitable adjustment under the Changed Conditions clause (Clause 4) or the Suspension of Work clause (GC — 11) because the conditions as represented and warranted were not realized.
“(d) That the Government had all control of the temporary (penstock) gates and when the contracting oflicer chose to inundate the contractor’s work site rather than release water through the penstock openings he has, in effect, suspended the contractor’s work for the convenience of the Government, thus entitling the contractor to an equitable adjustment under the terms and provisions of paragraph GC-11 of the contract specifications.”

 Rule 6, Hearings and, nature thereof, (1) The appellant, If lie so desires, ■will be accorded a full and complete bearing at wbicb be may offer tbe testimony of witnesses and confront and cross examine tbe witnesses for tbe Government. Hearings will be as informal as may be reasonably allowable and appropriate under all tbe circumstances. Tbe contractor and contracting officer or tbeir representatives may offer at a hearing such evidence or argument as they deem appropriate, subject however to tbe exercise of reasonable discretion by the presiding member, in supervising tbe extent and manner of presentation of such evidence and argument. Letters or copies; thereof, affidavits, or other evidence, not ordinarily admissible under tbe generally accepted rules of evidence, may be received in evidence in tbe discretion of tbe presiding member. Tbe weight to be attached to evidence presented in any particular form will be determined by the Board in the exercise of reasonable discretion under all tbe circumstances of tbe particular case. Tbe parties may, by stipulation in writing filed with tbe Board, agree upon tbe facts or any portion thereof involved in tbe appeal, and the stipulation may be regarded and used in evidence at the bearing; the parties may also stipulate the testimony that would be given by a witness if the witness were present. Tbe Board may, however, in such cases, require additional evidence. 20 F.R. 4130 (1955).

 Rule 6, * * * (2) Also, in tbe discretion of the Board, if the appellant does not desire a bearing, be will be accorded a conference with one or more members of tbe Board. Such a conference is not for tbe purpose of introducing any new matter into tbe record but may be utilized by an appellant to explain or argue matters of record. If any new matter is introduced at such a conference, consideration of tbe appeal will be deferred until the contracting officer has been apprised thereof and has had an opportunity to reply. Tbe contracting officer or bis representative will be afforded tbe right to be present at such conference. 20 F.R. 4130 (1955).

 On February 25, 1965, tbe parties filed a stipulation in this court reciting that Mr. Louis Spector presided at tbe hearing and thereafter was transferred to tbe Armed Services Board of Contract Appeals whereupon the matter was reassigned to Mr. Harold F. Blasky who prepared the Board’s decision and certified as to tbe completeness of tbe administrative record filed in this court.

 The same stipulation referred to in fn. 7, above, reflects the parties’ agreement that at the hearing tbe contractor offered at least two additional documents and tbe Government five such documents. Apparently, there was no record made of events transpiring at tbe bearing. Tbe serious consequences of failure to establish and apply orderly and systematic procedures at the administrative level is well illustrated by one occurrence in this case.
One of the documents that tbe parties agree was offered by tbe Government at tbe hearing is a letter of October 5, 1956, from tbe contracting officer to one of bis superiors dealing with the likelihood of flooding of tbe upstream relocation work in tbe Table Rock reservoir area by reason of tbe *643 advanced state of construction at the Dam. This letter is not included in the administrative record certified by Mr. Blasky as containing aU of the materials before him in his consideration and decision of plaintiff's; claim. Again, in the stipulation filed here on February 25, 1965, it is agreed that if Mr. Blasky were called as a witness in, this court he would testify that the materials contained in the subject matter of his formal certification constituted “the entire record considered by him in reaching his decision”.
Notwithstanding the foregoing, the Board decision of August 20, 1959, authored by Mr. Blasky, quotes extensively from the contracting officer’s October 5 letter and states, as to it: “A copy of this memorandum was made available to the Board by the appellant at the conference.” As previously noted, the parties agree that the letter was adduced at the hearing by the Government.
Thus, it is seen that the Board’s formal certification as to the documentary record considered by it in reaching its decision is significantly inaccurate in at least one respect. The difficulty is that while, as indicated, the parties have agreed that various additional documents were submitted to the Board for its consideration, they cannot agree that at the hearing plaintiff in fact submitted two documents that it says it did. One is a chart showing the progress and sequence of concrete placement at the Table Rock Dam, and the other is a letter of December 9, 1958, from the Dam’s contractor referring to negotiations had with the Engineers Corps in late April 1957, concerning the terms under which the contractor would agree to leave certain concrete monoliths at their present elevation for a period of thirty days.
In denying that these materials were brought before the Board by the plaintiff, the Government relies on the recollection of its trial attorney at the administrative hearing and on the fact that they are not included in the record certified by Mr. Blasky.
Because the Board’s Rule 3 [22 F.R. 4317 (1957)] authorizes either party to file additional documents with the Board at any time prior to final disposition of a case and because the plaintiff’s brief, filed with the Board subsequent to the hearing, repeatedly refers to the subject matter with which the challenged documents are concerned, it seems appropriate to regard the administrative record as including those documents for purposes of review here.

 The “Decision” as designated by the Board, was preceded by five pages of recapitulation of various facts agreed by the parties, statements of their respective legal contentions and specification of the issues presented by them for Board determination. In the context of assessing Wunderlich sufficiency of the Board’s actions, this background material, while conducive to perspective and general understanding of the controversy as presented at the administrative level, is without any real substantive significance for nowhere in it does the Board purport to register any determinations of fact or law made by it.

 “The conduit capacity is sufficient to pass the flow of White River except during flood periods when water will be temporarily impounded in the reservoir.”

 Paragraph 4 of the parties’ stipulation filed with the Board provided:
“Attached hereto as Exhibit No. 1 are the hydrographs and rating curves for the White River mentioned in paragraph SC-7c of this contract as being available for inspection at the office of the District Engineer, Little Rock District, 300 Broadway, Little Rock, Arkansas. The contractor did not inspect these hydrographs and rating curves in the District Office prior to bidding on this work. Briefly, these hydrographs and rating curves reflect the following data: The hydrographs reflect the frequency of flooding above Table Rock, together with the severity of flooding both as to intensity and volume. The rating curves give the probable range of natural rises of the river as not affected by the dam.”

 Paragraph 5a of the General Conditions of plaintiff’s contract provided as follows:
“The contractor shall within 5 days or within such time as determined by the contracting officer, after date of commencement of work, prepare and submit to the contracting officer for approval a practicable schedule showing the order in which the contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant, and equipment), and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The contractor shall enter on the charts the actual progress at the end of each week or at such intervals as directed by the contracting officer and shall immediately deliver to the contracting officer three copies thereof.”

 Tie notations entered on the blueprint referred to above, reflect the following sequence in plaintiff’s actual performance of its work under the subject contract after issuance of the notice to proceed on October 31, 1956:
“On November 16, 1956, plaintiff began excavation on an abutment, which was located at one of the highest elevations of its entire work site. It commenced the placement of concrete on this abutment on December 21, 1956, and completed the concrete work on February 17, 1957.
“Second, the plaintiff began excavation on pier No. 2, located on one of the stream embankments, on November 21, 1956. It commenced placement of concrete at this excavation on December 27, 1956, and completed concrete work there on February 27, 1957.
“Third, not until November 23, 1956, did the plaintiff begin excavation on pier No. 4, where it did not commence concrete placement until March 22, 1957. With subsequent work interruption caused by flooding, this concrete work was not completed until October 29, 1957.
“Fourth, plaintiff began excavation on pier No. 5, located on an embankment, on November 27, 1956. It commenced concrete placement on this pier March 29, 1957, and completed the same on June 14, 1957.
“Fifth, on November 28, 1956, plaintiff began excavation on pier No. 6, located on the same embankment and above pier No. 5. It commenced concrete placement on March 20, 1957, and completed the same on May 22, 1957.
“Sixth, on December 11, 1956, the plaintiff began excavation on pier No. 7. It commenced concrete placement on this pier on March 14, 1957, and completed the same on May 7, 1957.
“Seventh, on December 11, 1956, plaintiff began excavation on the remaining abutment, where it commenced concrete placement on March 13, 1957, and completed the same on May 1, 1957.
“Eighth, the last excavation begun on the entire job was with respect to pier No. 3 on December 19, 1956. Plaintiff commenced concrete placement at this pier on January 18, 1957, and, after the 5%-month flooding interruption, finally completed the same on December 4, 1957.”

 41 u.s.c. § 321.

 In tie course of pretrial proceedings, tie trial commissioner approved tie parties’ agreement, authorized by Rule 47(c)(1), to limit the court’s consideration to tie issue of liability, with determination of tie amount of recovery, if any, reserved for further proceedings.

 Pet. par. 21(b).

 In considering the status of this Board finding, as related to the ultimate liability determination to be made by this court it has not gone unnoticed, even though not raised by the plaintiff, that at the administrative level the plaintiff was found to be without fault or negligence with respect to precisely the delay for which the Board denied it additional compensation on the theory, in part at least, that the delay was avoidable and would not have occurred but for its negligence with respect to consultation of the hydrographic data and, in the light thereof, the scheduling of its work. In the introductory portion of the Board opinion (see fn. 9, supra) it is said that: “Because of circumstances hereinafter recited work on Piers 3 and 4 was delayed 173 days, from 3 April 1957 to 23 September 1957, such delay being beyond the control and without the fault or negligence of the contractor, whose contract performance time was extended accordingly.” [Emphasis added.]-.
The apparent dichotomy between the administrative conclusions reached, in the time extension context on the one hand and in the damage vein on the other, respecting the causal connection of the plaintiff’s negligence cannot, for two reasons, be reasonably deemed to require rejection of both simply for reasons of inherent inconsistency.
First, for the reasons previously stated (fn. 9, supra), the quoted expression from the Board opinion cannot be reasonably deemed a determination for Wunderlich purposes. The issue of time extensions was not before the Board and the context including its reference thereto is quite obviously altogether devoid of determinations of any type and wholly concerned with a simple recitation of background data.
Second, there is plaintiff’s complete finesse of the negligence determination contained in the Board’s DECISION even though the Government relies on the intrinsic validity of the determination in support of its cross-motion for summary judgment, under these circumstances there is no practical difference between this court’s affirming the determination because found to be correct, and affirming it because it is “final.”

 Pet. par. 21(a).

 This was the stipulated factual issue certified to the Board by the parties, fn. 3, supra.

 The letter states in part:
“X have been wondering if you knew that the Corps had approached us on a price to leave one or more blocks at a lower elevation to help limit the elevation of the pool. They asked me verbally for a verbal price back on April 29th, 1957, to leave Mono 18-21 at the present elevation for thirty (30) days. On April 30th we gave them a price which they never accepted. On May 10th they said they were considering opening the penstock gates, and I told them we could not open them without stop logs in which case we couldn’t puU the stop logs.
“It occurred to me that the Corps might have forgotten to tell you that they rejected our price for leaving the blocks low. If so, it might be a good bit of information to have.”
*****
The plaintiff’s brief before the Board, filed here as a part of the administrative record, is replete with references to the issue of leaving certain blocks low in late April, 1957, as a means of increasing discharge capacity.

 The question, involving a matter of contract interpretation, is one of law. Kaiser Industries Corp. v. United States, 169 Ct. Cl. 310, 340 P. 2d 322, 333-334 (196.5).

 “The conduit capacity is sufficient to pass the flow of White River except during flood periods when water will be temporarily impounded in the reservoir.” [Emphasis added.]